[Civ. No. 1871.   Third Appellate District.—September 30, 1918.]

## ELIZA HOWARD, Respondent, v. L. H. STEPHENS, Appellant.

PAROL GIFT OF LAND—QUIETING TITLE—FINDING SUSTAINED.—In this action to quiet title to a tract of land, alleged to have been the subject of a parol gift by the former owner to the plaintiff, and to cancel a deed executed by the plaintiffs' donor to the defendant subsequent to the gift to the plaintiff, the evidence is examined and held to be sufficient to sustain findings of the truth of the allegations of the complaint.

ID.—CLAIM MADE AFTER DEATH OF DONOR—EVIDENCE—CLEAR AND CONVINCING PROOF—QUESTION FOR TRIAL COURT—APPEAL.—Where gifts are first asserted after the death of the donor, they must be established by clear and convincing proof, and whether the evidence in a given case is clear and convincing is a question in the first instance for the trial court, and its conclusion is not to be disturbed unless the reviewing court can say, after an examination of the entire record, and all the circumstances surrounding the transaction, that such conclusion is clearly unwarranted by the evidence; if there is substantial evidence to support the conclusion reached below, the finding is not open to review on appeal.

ID.—VALUE OF IMPROVEMENTS.—In this case it is also held that the proof of the improvements made by the plaintiff was sufficient to bring the case within the rule that where the donee has accepted the promise, entered into possession of the land, made improvements on the faith of the promise, and thus changed his condition, the donor will be required to make good his gift; provided the expenditures were made upon the faith of the promise and were in the nature of lasting benefits and improvement to the land over and above the value of the use of the property to the plaintiff.

ID.—STATUTE OF FRAUDS—PART PERFORMANCE OF ORAL CONTRACT.—The doctrine that verbal contracts for the sale of land, if part performed by the party seeking the remedy, may be specifically enforced is an elementary principle in equity jurisprudence, and of general application throughout the American states.

APPEAL from a judgment of the Superior Court of Yolo County.   W. A. Anderson, Judge.

The facts are stated in the opinion of the court.

Elmer W. Armfield and Arthur B. Eddy, for Appellant.

Arthur C. Huston, for Respondent.

CHIPMAN, P. J.—The action is to quiet plaintiff's title to a certain forty-acre tract of land situated in Yolo County, to wit, the northeast quarter of the southeast quarter, section 20, township 10 north, range 2 east, M. D. B. & M., and to have canceled a certain deed to the same land under which defendant claims title. The cause was tried by the court and plaintiff had findings and judgment in her favor. Defendant appeals from the judgment under the alternative method.

It is alleged in the complaint that, on February 22, 1875, Rhoda S. Bonynge was the owner of said land and that on said day she "made a parol gift of the said tract of land to the said plaintiff herein, and stated to the said plaintiff that the said land should then and there be her property, and that she should immediately occupy the same; that acting upon the said gift, as aforesaid, the said plaintiff immediately took possession of the said tract of land, and ever since said date has been and now is in the exclusive possession thereof; that the said plaintiff so entered into and has ever since remained in the possession of the said premises with the knowledge, consent, and concurrence of the said Bonynge, and has made lasting and valuable improvements thereon, and paid the state and county taxes thereon. That during all of said times herein referred to said plaintiff has been in the open, notorious, and exclusive possession of the said land; that while said plaintiff was in such possession, to wit, on the seventh day of March, 1914, the said Rhoda S. Bonynge conveyed the same to the defendant, L. H. Stephens; that the said Stephens knew that said plaintiff was in possession of the said premises at the time of said conveyance, and also knew that the said plaintiff had been in the possession thereof for many years previous to such conveyance to him; that said Stephens accepted said conveyance with full notice of all the legal and equitable rights of the said plaintiff in and to said premises and in subordination to those rights; that said deed to said Stephens was made without any consideration."

As a second cause of action plaintiff claims ownership by adverse possession.

A general and special demurrer was overruled and defendant answered, specifically denying the averments of the complaint as to plaintiff's alleged ownership and means of acquiring the same.

It is alleged in the answer as follows: "That said Rhoda S. Bonynge never at any time gave to said plaintiff the title to said property or any interest therein, and never at any time promised to give to said plaintiff the said title to said property or the title to any interest therein; and that the right of said plaintiff in said premises was a mere tenancy at will and disposition thereof was at all times subject to the right of said Rhoda S. Bonynge to terminate the same; that said conveyance was made to this defendant for the purposes expressed by said Rhoda S. Bonynge at the time said conveyance was made, to wit, that the legal title to said premises should be conveyed to this defendant, that this defendant should permit the plaintiff in this action to retain the possession thereof or the right to the use of the rents, issues, incomes, and profits thereof for and during the term of her natural life, and that upon her death this defendant should sell the said premises and dispose of the proceeds thereof by distribution to certain persons named by the said Rhoda S. Bonynge at the time the conveyance was so made to this defendant as aforesaid."

The court made the following findings of fact:

"1. That all of the allegations of the said complaint are true.

"2. That all of the allegations of the first cause of action of said complaint are true.

"3. That all of the allegations of the second cause of action of the said complaint are true.

"4. It is not true that during all of the time mentioned in the plaintiff's complaint said Rhoda S. Bonynge did permit said plaintiff to occupy said premises and to collect, retain, and keep the rents, issues, and profits thereof for the support and maintenance of the plaintiff. It is not true that said Rhoda S. Bonynge never, at any time, gave to said plaintiff the title to said property or any interest therein. It is not true that the said Rhoda S. Bonynge never, at any time, promised to give to said plaintiff the said title to said property or the title to any interest therein. It is not true that the right of plaintiff in said premises was or is a mere tenancy at will; it is not true that the control and disposition thereof was at all times, or at any time, subject to the right of the said Rhoda S. Bonynge to terminate the same. It is true that, at the time of the conveyance from Rhoda S. Bonynge to the defendant, she stated to him that the purpose of said con-

veyance was to convey the legal title to said premises, and that said Stephens should permit the plaintiff to retain possession thereof, or the right to the use of the rents, issues, income, and profits thereof for and during the term of her natural life; that said Bonynge also expressed said purpose at the time of the making of the said conveyance to the said defendant, that upon her death the defendant should sell the said premises and dispose of the proceeds thereof by distribution to certain persons named by said Rhoda S. Bonynge at the time the said conveyance was made to said defendant. However, in this respect, the court finds that at the time of the conveyance of said property by said Rhoda S. Bonynge to the said defendant herein she was not the owner thereof, had no interest whatever in the same, and had no right, title, or interest of any kind or character, either in law or in equity, in or to the said property or any part thereof; that at said time the said plaintiff herein was the owner of said property.

"5. That the defendant, L. H. Stephens, did not acquire any right, title, or interest in and to said property by virtue of the said conveyance made to him by the said Rhoda S. Bonynge, or otherwise; that the said defendant, Stephens, is not and never has been the owner of any right, title, or interest in and to said property, or any part or parcel thereof; that the said plaintiff, Eliza Howard, is the owner of the said lands and premises described in said complaint, and the whole thereof, and is entitled to the possession thereof."

As conclusions of law the court found that plaintiff is the owner of said land and that the deed executed and delivered to defendant be annulled and canceled.

In his opening statement counsel for defendant said: "And so that your honor may understand the situation as we see it, we at this time and at all times during the trial of this case will admit that so far as Mrs. Bonynge is concerned, that she did intend that Mrs. Howard, the plaintiff in this case, should have a life estate in the property, or the right to the use of the rents, issues, incomes, and profits for and during her natural life, but the remainder was absolutely subject to the control of Mrs. Bonynge, and has been conveyed to Mr. Stephens." The sole question in the case is thus presented.

Defendant makes the following contentions: 1. That the finding that a parol gift was made by Mrs. Bonynge to plaintiff in 1875 is not supported by the evidence; 2. Assuming a

parol gift to have been established, "the same is absolutely void and unenforceable under the statute of frauds," as the proof of the alleged valuable improvements on the premises "does not measure up to the requirements of the decided cases"; 3. That the judgment, so far as it is founded upon adverse possession, is not supported by the findings.

It appeared that plaintiff and her husband, Stephen A. Howard, came to California in 1861 and took up their residence in Yolo County in a neighborhood called Buckeye, some twenty miles distant from the town of Woodland, and were engaged in farming. Mrs. Rhoda Bonynge, then Rhoda Stephens, plaintiff's sister, came to the state in 1862. She was then unmarried and made her home with her sister, Mrs. Howard. About three years later she married C. W. Bonynge and thereafter and until her husband removed to London, England, resided in San Francisco. Mrs. Bonynge made frequent and protracted visits to her sister, Mrs. Howard, their relations being of the most affectionate character, so remaining until Mrs. Bonynge's death at her home in London in June, 1914, except for an incident which occurred in relation to some property in Yolo County belonging to Mrs. Bonynge and which had been looked after and managed by plaintiff and her husband for a long period of years. This incident will be referred to later. Mrs. Bonynge was a very warm-hearted and generous woman and very fond of her relatives, several of whom resided in California. This generosity manifested itself by gifts of money and property. To one of her sisters, Mrs. Hawxhurst, she gave a dwelling-house in San Francisco. It was during one of her visits at the home of her sister that Mrs. Bonynge announced her intention of purchasing a more suitable home for her sister, Mrs. Howard.

Plaintiff's deposition was taken prior to the trial (October, 1915), in which the foregoing facts appear. She testified that her sister, Rhoda, before her marriage to Mr. Bonynge, "made her headquarters" with witness for about three years; that her family lived at Buckeye about ten or twelve years before moving to the land in question to which she testified they moved "about forty years ago." She testified: "Q. Now, how did you come to move on this tract of land that we are having this suit about? A. Well, she bought the place and give it to me. Q. By 'she' you mean whom? A. My sister, Mrs. Bonynge. Q. Well, now, what did she say to you in re-

gard to this place before you moved there? A. Well, she bought it and made it a present to me. Q. Made you a present of it? A. Yes, sir. Q. This conversation occurred before you moved on the ranch, did it? A. Of course, it did. Q. Now, after the conversation occurred, did you and Mr. Howard and your family move on the ranch? A. Well, Mr. Howard went down first and fixed it up, you know, and made a home, I guess, for a month or six weeks before we moved there. Q. What was the condition of the property at the time you went on it, did it have any buildings on it? A. No, nothing to speak of, worth speaking of. Q. Did it have any barn? A. No, sir. Q. What kind of a house or dwelling? A. Oh, just a shack like, so we went down there and had it all fixed up in good shape. Q. Was it fenced at that time? A. No, sir—that is, it was fenced, but you know how the fencing they used was forty years ago, old acorn wood—I mean— Q. Oak trees? A. Oak trees, they sawed down and made posts of; they all rotted down; the first thing we done was to make new fence, build a new barn and put up a windmill. Q. Did you build a dwelling? A. Yes. Q. Now, subsequent to the putting up of that barn, was it destroyed by fire? A. Yes, sir. Q. Did you rebuild it again? A. Yes. Q. Were any of the other buildings on the lands ever destroyed by fire outside of the barn? A. No, sir. Q. About what kind of barn did you put there the first time? A. Four hundred and fifty dollar barn, the first one. Q. Do you know how much you spent on the house? A. Oh, laws, no; I used to keep account and did for years. Q. I mean, Mrs. Howard, how much you spent right at the first time, when you put the house on the place? A. I don't know that I could tell you that; my husband was living then, he attended to all such business, didn't bother me. I didn't know what business was. Q. After you moved on the place involved in this action, how long did you live, actually live, on the place before you left it? A. Well, I must have lived there twenty years or more. Q. To put it in another way, were you living there at the time of Mr. Howard's death? A. Oh, yes, yes. Q. For how many years after Mr. Howard's death did you remain on the place? A. I guess for about five years. Q. And then when you did leave the premises, did you lease them to anybody? A. Yes, I rented it out. Q. In whose name did you rent it? A. My own. Q. Who collected the rents? A. I did. Q. And kept

them? A. Yes, sir. Q. During all of the time following your occupation of the land after Mrs. Bonynge told you she would give it to you and to the present time, who has paid the taxes on the property? A. Well, indeed I have. Q. You have paid them all the time? A. Always. Q. Now, going back, Mrs. Howard, at the time you moved on the premises, was Mrs. Bonynge then living in California when you went out on the ranch? A. When I first moved there? Q. Yes, when you first moved there. A. Yes, she was here then." She testified that after moving to their new home Mrs. Bonynge visited her many times— "come and stay a month and bring her children," before she made her home in England. "Q. After you moved on the place, did you have any conversation with Mrs. Bonynge in regard to her giving you a deed to the place? A. Well, the last time she was over here we were talking about it, she was so glad to see how we had improved everything and made such a lovely home, that I says, 'Well, that is all right, of course; why don't you deed me the place?' I had no deed to it, but it was a gift. She says, 'Well, if I deed it to you, you would do just like Sister Kate'—she gave her a home in San Francisco and deeded it to her and as soon as her husband needed the money, she mortgaged it and she lost the home, so she says to me, 'The way it is, it is yours, and if you die first, it will go to your children,' and so I never gave it a thought any more, just went ahead as though it was all right. Q. Well, do you remember about the year that she paid her last visit here? A. No, sir, I don't, but her daughter, her oldest daughter, was a grown young lady then. Q. That was after she had removed to England? A. Yes, after they were located there. Q. Subsequent to her last visit to you on the ranch when this conversation occurred, did you ever have any correspondence with her? A. Always. Q. How long did the correspondence continue? A. Until her death." She testified that after Mr. Bonynge moved to England many letters passed between them, in none of which, "until the dispute arose over the deeding of this property," did Mrs. Bonynge say anything in regard to plaintiff's ownership of this property; that witness and her husband managed and attended to the leasing of the Esparto ranch for Mrs. Bonynge, collecting and accounting for the rents from year to year for many years and at no time did Mrs. Bonynge ask for any accounting of rents for the land

in question. It was the sale of this Esparto ranch to Mr.
Clowe (Mrs. Howard's son-in-law, we infer) at a price Mrs.
Bonynge thought too low, though previously agreed to by her,
that caused some criticism by Mrs. Bonynge. She claimed
that she was not informed of his purpose to put water on the
land, thus enhancing its value, which had she known she
would not have sold the ranch at the price agreed upon. Mrs.
Howard seems to have been blamed somewhat for this, and by
her it is claimed, not without some show of reason, that the
incident had something to do with Mrs. Bonynge's making the
deed to the property in question to defendant. At the trial
Mrs. Howard was called as a witness and testified to the cir-
cumstances connected with the gift. She was asked again to
state what was said by Mrs. Bonynge ''in regard to her mak-
ing a deed to this property to her,'' and answered: ''Well, she
gave Mrs. Hawxhurst a home and she had mortgaged it, you
know, for money for her husband to spend in his business, so
they lost it, and that was why, now, she says, 'Your home will
be yours and your children's,' but she says, 'I'll not give you
a deed to it until later.' Q. Until later? A. Yes, sir, and
so Mrs. Clowe wanted to buy the place. I asked for the deed,
you know. I didn't know there was any trouble. Q. How do
you mean, you didn't know there was any trouble? A. Well,
of course Mrs. Bonynge didn't give me the deed as she prom-
ised to; I didn't know what the trouble was. . . . The Court:
In one of the answers in the deposition, this one thing I
wanted to have Mrs. Howard speak about; on page 6—it is
in about the same relation that you were just questioning.
You made part of this answer, Mrs. Howard: 'The way
it is'—this is in response to this matter in regard to her giv-
ing you a deed: 'The way it is, it is yours, and if you die first
it will go to your children.' Now, is that the exact language,
or is that substantially the language that she used? A. Yes,
sir. Q. And what did you understand by that, that she was
yet to give you a deed or something before it would go to your
children? A. Well, the understanding was that if—we
didn't think but what I would die first, I was ten years older
than she was—that she would see that it went to my children.
Mr. Huston: What the judge is trying to get at, Mrs. Howard,
is whether or not, as I understand it—is whether or not Mrs.
Bonynge told you that the property was to be yours outright,
or whether you were to have it, and at your death it would go

to your children. That's what you have in mind? The Court: Yes. Mr. Huston: In other words, whether it was an absolute gift to you, or then to your children? A. Yes. Q. Which was it? A. It was to me and then to my children, and if I wanted to sell the place—you see, now, Mrs. Clowe said she would take it. The Court: The only thing that bothered me was whether something else was to be done. Mr. Huston: All right. Q. Explain whether it was to be your place outright, or whether it was to go to you and then to your children. A. It was my place outright. Mr. Huston: I'll read you so you can get the connection. This is a talk after you moved on the place, you will notice: 'Did you have any conversation with Mrs. Bonynge in regard to her giving you a deed?' Now, that's after you got out there. Answer: 'The last time she was over here we were talking about it; she was so glad to see how we had improved everything and made such a lovely home that I says, 'Well, that's all right, of course; why don't you deed me the place?' I had no deed to it, but it was a gift. She says, 'Well, if I deed it to you, you would do just like Sister Kate.' She gave her a home in San Francisco and deeded it to her and as soon as her husband needed the money she mortgaged it and she lost the home, so she says to me, 'The way it is, it is yours, and if you die first it will go to your children,' so I never give it a thought any more, just went ahead and thought it was all right. A. Well, that's all right, too. Q. And that was the talk you had with her afterward? A. Yes, sir. Q. Before you moved on the place was there anything said that you were to only have it for your life, or whether you were to have it outright? A. No, I was to have it outright, or I wouldn't moved there any other way. Q. Before you moved there, as I understand your testimony, you and Mr. Howard were living over there near Buckeye, farming it there? A. Yes, my children was old enough to be in college; she thought I ought to move down there, so I did. Q. Then, as I understand you, she said it would be yours outright, and she held this deed back so Mr. Howard could not mortgage it? A. Yes, that's what she said, because he was trading all the time and she says, 'You would do like Sister Kate,' and I said, 'I guess I would.' Q. Can you state whether Mrs. Bonynge ever at any time prior to her deeding this property to Mr. Stephens made any claim in your presence or to your knowledge that you were only to have this

as long as you lived? A. Never did. Mr. Huston: I think that's all I have. Mr. Armfield: Is that all, Judge? The Court: Yes, that's all; but of course there are remarks in there to which you could give two interpretations. Q. You felt, did you, Mrs. Howard, at the time the property was purchased, that it was purchased for you absolutely? A. Yes, sir, absolutely. Q. And in your conversation with Mrs. Bonynge she indicated to you the same whenever you spoke of it? A. Yes, sir.'' Mrs. Howard testified that she first learned of the deed to defendant when she saw it mentioned in a local newspaper; that she shortly afterward had a conversation with defendant about it at her home when Mrs. Clowe was present. ''Q. Can you state just what was said between you and Lawrence Stephens at that time in regard to this property, substantially as you remember it, stating what you said and what he said, and what, if anything, Mrs. Clowe said? A. I said, 'Why, Lawrence, I see you have got a deed to my home.' He says, 'Yes.' I says, 'How did it happen, what is the cause of it?' He says, 'I don't know, Aunt Liza; it is a mystery to me; I didn't know Aunt Rhoda—never had a letter from her. Q. He never had a letter from her? A. Not until she wrote to him that she wanted to give him a deed to my home, so I says, 'Why, Lawrence, the best thing you can do to save trouble is to deed it back to me.' Q. What did he say to that? A. He says, 'I can't unless I had her consent,' you see, so he said then— I says, 'Well, you write to her then and see the cause,' I says, 'I don't understand what it is done for; it is undermining work; that is a mystery to me.' Q. What did he say in regard to writing to her? A. He said he would. Q. Then after that conversation did you have any other talk with him, a second one? A. No, sir, I never did. Q. Never heard anything more about it? A. No, sir, nothing at all.''

J. C. Maxwell testified that he had lived in Yolo County for sixty years and in the Buckeye neighborhood when plaintiff's family resided there; that he knew the Howards and had known Mrs. Bonynge ''all of her life nearly''; that he remembered the fact of the Howards' moving to the land in question. ''Q. Now, before Mr. and Mrs. Howard moved on to this place north of Woodland, or about that time, did you meet Mrs. Bonynge anywhere? A. Yes, sir. Q. Where? A. Several times. Q. Now, did you ever have any conversa-

tion with Mrs. Bonynge in regard to Mrs. Howard coming on
to this place? A. Well, twice, yes, sir. Q. And where was
your first conversation? A. At Mr. Howard's. Q. At Buck-
eye or Woodland? A. Yes, sir. Q. And where was your
second conversation? A. At Mr. Joe Stephens' at Madison.
Q. And on what place? A. Madison. Q. At Madison? A.
Yes, sir. Q. And was it before or after Mrs. Howard came
to Woodland? A. It was before. Q. Both conversations
were before? A. Yes, sir. Q. Can you tell the court, as
near as you can recollect, what was said between you and Mrs.
Bonynge upon this subject, giving us substantially the con-
versation? A. Which conversation? Q. The first one. A.
Mrs. Bonynge was unwell and was lying on a couch, and I
came in and was talking, and in the conversation, during the
time, the children came in from school. Q. Mrs. Howard's
children? A. Yes, and she looked at them and she said, 'It's
too far for the children to walk,' but she said she was look-
ing at a place to buy for her sister—she always called Mrs.
Howard her sister; that's about all—she said she was looking
at a place at that time. Q. What did she say in the second
conversation you had with her? A. The second time I don't
remember anything more than she said she had bought the
place, when Mr. Stephens and Mrs. Stephens, Mr. Stephens'
first wife, and I were talking to her; she said she had bought
it, and we all spoke about the place. . . . Q. Can you think of
anything else she said in regard to this property? A. No, sir,
I can't. Q. And that was before Mrs. Howard moved over
here? A. Well, yes, sir, that was before Mrs. Howard came
to Woodland. Q. Now, I want to ask you what, if anything.
was said as to the education of the Howard children; was
there anything said? A. Well, she said she was—in our first
conversation she said that it was too far for the children to
walk; they were walking to the Union school house; it was
about two or three miles. She said she was looking at a place
near Woodland to buy for her sister so that the children
would be nearer school. Q. And in the next conversation she
informed you that she had bought it? A. That she had
bought the place. I don't remember anything else she said
about it, only that she had bought the place, in the conversa-
tion.''

Mrs. Kate Hawxhurst, sister of Mrs. Bonynge and of plain-
tiff, a witness for defendant, testified that Mrs. Howard

moved to the land north of Woodland in 1875. "Q. Did you at about the time, or at the time in 1875, when the Howards moved to this place north of Woodland, did you have any conversation with Mrs. Bonynge relative to that place? A. Yes. Q. Where? A. In San Francisco. Q. And at your house, or her house, if you know? A. Oh, I don't know. The conversation was what she told me—of course I know nothing except what she told me. Q. Was anyone else present? A. That I don't know. Q. And what did she say to you? Mr. Huston: Just a minute. Was Mrs. Howard present? Mr. Armfield: No. Mr. Huston: Object on the ground it is incompetent, any declaration or statement of Mrs. Bonynge in the absence or out of the presence of Mrs. Howard cannot bind her, is self-serving, and for the purpose of establishing any fact in this case is hearsay, irrelevant, and immaterial. Mr. Armfield: Even under the doctrine of Bury against Young this would be admissible. It is a statement made by Mrs. Bonynge against her own interest; and further, under the later doctrine laid down in Williams against Kidd and *Rice* v. *Carey* it is admissible, in any event, whether it had been against Mrs. Bonynge's interest or not." After some further discussion— "The Court: I will admit the testimony; objection overruled. I understand the evidence will be short? Mr. Armfield: One question only, I think, on this particular point. The Witness: She said that she had bought this ranch and given Mrs. Howard the use of it for her lifetime, so that her children might have better advantages in Woodland than they had out at Buckeye. Mr. Huston: I move to strike it out on the grounds contained in our objection. The Court: Objection overruled." She also testified to having received a letter from Mrs. Bonynge, bearing date February 28, 1914, which was introduced in evidence over plaintiff's objection on the grounds previously stated and particularly that it was the declaration of Mrs. Bonynge forty years after the event of which she speaks. Among other things, the letter stated:

"I am sorry I can do nothing more for you now. I have written to Lawrence Stephens, Brother Larry's eldest son. I have told him that when Sister Eliza dies he can sell the forty acres of land which I own outside of Woodland and divide the proceeds between you, Laura Marshall, Bunce Stephens, Mary Birch, his, Bunce's, sister, and himself. Nothing can be done before Sister Eliza's death, for we loaned this place

to her for her life, and the rent of it is what she lives on. It will not be much, but it is all that I can give. I am sending you two parcels of my best and newest dresses. I don't think I shall ever be well enough to wear them again.

"With best love,

"Yours affectionately,

"RHODA BONYNGE."

She also testified that in a conversation with Mrs. Howard "two or three years ago," Mrs. Howard said to her: "Mrs. Clowe has always wanted to own that place [the land in suit] and wanted to buy it from the Bonynge's." Mrs. Howard testified that no such conversation occurred.

L. H. Stephens testified in his own behalf. He is the son of L. D. Stephens—Mrs. Howard and Mrs. Bonynge's brother— and nephew of Mrs. Bonynge. Witness testified that he was born in 1881, some years after Mrs. Howard had moved to this property, and that he knew Mrs. Howard was living on the place. He testified that the title to the property stood in the name of Rhoda Bonynge. Over objection he testified that it was always understood by the Stephens family that this forty acres "belonged to Mrs. Bonynge and that Aunt Eliza [plaintiff] had the use of it for her lifetime"; that the first time he knew of Mrs. Bonynge's desire to convey the property to him was when she wrote to him, the letter being dated February 13, 1913. In this letter a request is made to collect the amount due on a certain insurance policy on the life of Mr. Bonynge, who had recently died in London. Of this forty-acre tract she wrote:

"I hope you or brother Larry are attending to the taxes on the forty acres I have there, which after Aunt Eliza's death must be sold and the money equally divided between Aunt Kate, Laura Marshall, Bunce Stephens, Mary Birch, his sister, and yourself, so you will understand what I want done in case of my death. Unless I change my mind in the meantime I have thought of putting this land in the name of the bank so as to escape death duties but I don't know if it would be wise to do so.

"With best love,

"Yours affectionately,

"RHODIE S. BONYNGE."

The next letter received by him was dated February 20, 1914, in which she speaks of several matters she desired at-

tended to and, among others, certain bonds which had been sold—''You will find out from my dear brother Larry, your father—whose memory is as bad as my own—he sold the bonds for me.'' She also speaks of the money paid for the Esparto ranch, stating that the money belonged to Virginia Deerhurst, her daughter. She wrote:

''I want you to have a deed made out there and sent to me at once, of the forty acres of land which Aunt Eliza has the use of for her life, situated just out of Woodland, and I will deed it to you. Then I want, after Aunt Eliza's death, you to sell it for me and divide the money equally between Kate Hawxhurst, Laura Marshall, Bunce Stephens, Mary Birch, his sister, and yourself. Now, Lawrence, don't neglect these things. There is no time to be lost, and if you can't attend to it I must get Walter Bonynge to do it for me. I don't want to leave anything in my name in America, after the trouble and worry of the few things Mr. Bonynge left there.

''With best love to you,

''Your affectionate Aunt,

''RHODIE BONYNGE.''

A letter written by Mrs. Bonynge to defendant's father, L. D. Stephens, dated September 4, 1912, was introduced. In this letter, among other things, she said: ''Write me what I ought to get for the place I have near Woodland, forty acres and a little house on it. I have always left it to Eliza but I don't think she cares for it now. I would prefer giving her something in the way of the rent she gets for it.'' Some other letters followed in which this forty-acre tract was mentioned as previously and, finally, March 24, 1914, she writes, as we understand the letter, sending the deed to defendant The deed is dated March 7, 1914, and was recorded April 8, 1914. The date of its actual execution and acknowledgment does not appear. These letters went in over plaintiff's objection as tending to show Mrs. Bonynge's intention. There was some evidence, taken from the books of the Bank of Woodland, that for certain years payment of certain high school taxes on this land had been charged to Mrs. Bonynge's account, of which plaintiff testified she knew nothing. There was also evidence, taken from the Bank of Woodland books, showing that a credit of one dollar per year as rent had been credited to Mrs. Bonynge's account for certain years, as to which Mrs. Howard testified she had no knowledge of any

payments made for rent and never made any or authorized any to be made. The knowledge of such credits was not brought home to Mrs. Howard.

Virginia Deerhurst, married daughter of Mrs. Bonynge, in a deposition taken in London, testified to conversations she heard between Mrs. Bonynge and her husband at the time the Esparto ranch was sold to Mr. Clowe, as to which she said her mother was very much annoyed. The sale was made in June, 1912. "Q. What did Mrs. Bonynge say about the ranch in question, that is, the one there is the dispute about? A. I heard over again that my aunt was to live there for her life. I mean that is one of the dates when I heard it again. . . . Q. Do you remember having any conversation at all as to what was to happen after your aunt died? A. What was to happen was, that my aunt was to be left in full possession and never disturbed in any way; but at that time I believe that my sister and I would have had the property. It would simply have come with her other property. . . . Q. Try and give us, as nearly as you can recollect, what was said. Did she say anything as to what was to happen with regard to your aunt living at the ranch? A. That she was to be left absolutely as she always had been. Mrs. Bonynge thought of that very often, and always thought of how to arrange it. Q. You say 'absolutely.' Do you mean she was to be left without being interfered with? A. Without being disturbed in any possible way. Q. For how long? A. For her life." The witness identified certain five or six books of account in which certain entries are found referring to the land in question. These books bear different dates, in 1880, 1881, 1883, 1884, 1885, and in 1891. The entries called to the attention of the court speak of this land as "Ranch occupied by Howard"; "Dep. by Howard, $250.00"; "Rent paid by Howard, $1.00," of which latter there were three similar entries of different dates. No explanation of these entries was made and they went in under objection.

With the exception of the declarations made to Mrs. Hawxhurst, as she testified, about the time plaintiff's family moved to the land in question, there were none shown until in the letter written by Mrs. Bonynge to her brother, L. D. Stephens, in 1912, and in subsequent letters to different members of the Stephens family. But at no time during all these years did Mrs. Bonynge inform plaintiff that her intention in giving her

the land for a home was that she should have only a life estate in it. The land, in 1875, unimproved as it was, could not have been of much value and in its then condition was uninhabitable. To occupy it as a home the Howards were compelled to build a dwelling, to fence the land, and to erect a barn and other conveniences suitable for the enjoyment of the premises. Plaintiff testified that unless she had been given absolute ownership of the land her family would not have taken possession and they would not have made the improvements necessary to its use. Considering the generous nature of Mrs. Bonynge, her relations to the Howard family at the time, and her avowed affection for her sister, as well as the motive she had in making the gift, we think the court was justified in accepting the testimony of Mrs. Howard as true.

We are aware of the rule, relied upon by appellant, that in such a case as this, where gifts are first asserted after the death of the donor, they must be established by clear and convincing proof, and that it has even been held that gifts of this character are regarded with suspicion by the courts (*Humble* v. *Gay,* 168 Cal. 516, [143 Pac. 778]); still, a careful reading of the testimony of Mrs. Howard, corroborated as it is in considerable degree by that of witness Maxwell, convinces us, as it manifestly convinced the learned trial judge, that Mrs. Howard's account of the transaction bears evidence of sincerity, honesty, and truthfulness.

Whether or not the court erred in admitting proof that it was generally understood among the Stephens family that the gift was only a life estate, as to which the testimony was both ways, and in admitting the declarations of Mrs. Bonynge made, with the one exception above noted, forty years after the transaction, are questions we need not consider. If it was error, as to which we express no opinion, the error is not available to respondent since she had judgment. But in considering this class of evidence the court, no doubt, deemed it of less value than the positive testimony as to the nature of the gift and, therefore, insufficient to overcome the force and effect of such direct and positive testimony.

Whether the evidence in a given case is clear and convincing is a question in the first instance to be determined by the trial court, and its conclusion is not to be disturbed unless the reviewing court can say, after an examination of the entire record and all the circumstances surrounding the trans-

action as there disclosed, that such conclusion is clearly unwarranted by the evidence. ''If there is substantial evidence to support the conclusion reached below, the finding is not open to review on appeal,'' even where the law requires proof of the fact to be clear and convincing. (*Ward* v. *Waterman,* 85 Cal. 502, [24 Pac. 930]; *Steinberger* v. *Young,* 175 Cal. 81, [165 Pac. 432].)

It is contended that the proof of the improvements made is entirely insufficient to bring the case within the rule as enunciated in *Burris* v. *Landers,* 114 Cal. 310, [46 Pac. 162], and other cases. We think the facts in this case much stronger and more persuasive than those shown in the Burris case. Here the property was unimproved and, so far as appears, nonproductive. To convert it into a home such as must have been in the minds of the parties it was necessary to expend considerable money to make it habitable even for the simple life of those early days. The improvements were not temporary nor trivial, but substantial and commensurate to the uses contemplated, and, we think, were sufficient to bring the case within the rule.

The point is made that the gift was void because the improvements were insufficient to take the case out of the statute of frauds. ''The doctrine that verbal contracts for the sale of land, if part performed by the party seeking the remedy, may be specifically enforced,'' was said, in *Kinsell* v. *Thomas,* 18 Cal. App. 683, 695, [124 Pac. 220], to be ''an elementary principle in equity jurisprudence and of general application throughout the American states.'' Justice Hart, in the opinion, takes occasion to give the origin and philosophy of the rule.

It may be conceded that the evidence did not support the finding as to plaintiff's second cause of action. The judgment is fully supported by the findings upon the first cause of action.

The judgment is affirmed.

Burnett, J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on October 30, 1918, and the following opinion then rendered thereon:

CHIPMAN, P. J.—Appellant seeks a rehearing upon the single proposition stated thus: ''Assuming a parol gift has been established, the same is absolutely void and unenforceable, as the plaintiff's proof is not of that character which justifies a court of equity in invoking the equitable rule of estoppel in order to take the case out of the operation of the statute of frauds.'' Reliance is placed upon the reasoning in the case of *Burris* v. *Landers,* 114 Cal. 310, [46 Pac. 162]. In that case ''plaintiff's real claim was that he entered with knowledge and approval of Landers, and under Landers' promise that he would thereafter, upon demand, make him a deed, and that relying upon that promise, he made lasting and valuable improvements upon the property.''

Appellant concedes that a present gift was established from Mrs. Bonynge to Mrs. Howard, which, though defective in form, equity will perfect. Such was not the case of *Burris* v. *Landers,* of which the court said: ''It is an effort simply to enforce a promise to make a gift, the execution of which was never attempted to be completed by deceased in his lifetime.'' After stating the nature of the action the court said: ''This, it will be noted, is a different action from one to compel the perfection of a gift presently but incompletely made.'' In the case cited the property consisted of a dwelling and lot in the city of San Francisco and was occupied by plaintiff about three years when the donor died. The court held that, even in such a case as this, the donor can be compelled to make his promise good where ''the donor by promises induces the donee to change his position to his detriment.'' In summing up the case the court said: ''The evidence, then, in support of the findings, shows that the total expenditure of the plaintiff did not equal the rental value of the property during the time of his occupancy, and that the so-called permanent improvements were rather expenditures made to suit the convenience and taste of the occupant, and were not such as the law contemplates, of a character to enhance the value of the realty.''

We need not stop to inquire whether the rule as to the quantity and character of evidence is the same in both executed and executory gifts. Assuming that the rule is the same in both classes of cases, appellant relies upon certain testimony given to the effect that the property had a rental value of four hundred dollars per year for the five years preceding the commencement of the action and that Mrs. Howard

testified that it was worth that less taxes and expenditures, which she fixed at one hundred and fifty dollars per year, and that her family had made more than that out of it. Conceding this much, the evidence was that when the gift was made the property was practically unimproved, and to make it habitable and of any value as a home they built a .dwelling, barn, and convenient outhouses and fenced the land. There was no evidence that it had any rental value prior to the making of these improvements. On the contrary, the only rental value shown was of the property after the Howards had improved it. Such was not the case in *Burris* v. *Landers.* The Howards lived upon the premises after making them suitable as a residence for thirty years under the belief that the property had been given to Mrs. Howard. The donor, Mrs. Bonynge, visited them frequently, and, of course, knew of their expending the money required to make the place capable of supporting the family. The gift having been satisfactorily established, we do not think the donee should be precluded from perfecting her title because the gross rental value for all these years would greatly exceed the cost of the improvements made by the donee, especially as this rental value is the result of these very expenditures.

"The rule may be considered, as well settled," said Mr. Justice Henshaw, in the case cited, "that where a parol gift of real estate is made *in praesenti,* and the donee has entered under the gift, and has made permanent and valuable improvements upon the realty, and the circumstances are such that it would be unjust to the donee if he were thereafter to be deprived of the property by reason of imperfections in the gift, equity will treat the acts of the donor, together with the acts of the donee, as being such performance of the gift as will relieve the contract from the operation of the statute of frauds, and it will, under such circumstances, lend its assistance to the perfection of the donee's title." The evidence, we think, fully met the requirements of the rule as thus stated. The fact that the permanent and valuable improvements spoken of have given to the property a rental value it did not theretofore have is a false quantity. Otherwise the very thing equity requires to be done would defeat its object.

The petition is denied.

Hart, J., and Burnett, J., concurred.