## THOMPSON v. RAY, administrator.

92  285
e123 555

1. A parol gift of land, accompanied by possession, based upon a consideration meritorious and to some extent valuable, is not of itself sufficient to pass title into the donee; nor will the making of valuable and permanent improvements upon the property, after the death of the donor, complete the gift, although the materials for such improvements may have been ordered during the donor's lifetime and with his knowledge.

2. An interrogatory which assumes the existence of a material and vitally important fact, and suggests an answer which will establish that fact, is leading, and for this reason there was no error in rejecting the answer to the same, it not appearing or being suggested that the objection was not in writing or that it was not made at the proper time.

3. The evidence warranted the verdict, and there was no error in refusing a new trial.

July 17, 1893.

Ejectment. Before Judge HARRIS. Campbell superior court. February term, 1892.

On May 23, 1889, the administrator of Matthew Reid brought ejectment for a house and lot in Fairburn known as the McKown place. Mrs. Thompson filed an equitable plea, the nature of which will appear from the following report of the evidence.

It appeared that Reid had owned the premises from March 22, 1884. Vickery testified that Reid remained in possession from that date until his death, by himself and through tenants. He died in 1888. Witness was then acting as his agent, had charge of this house and lot, had one of the keys to the house, and Mrs. Edmonds, sister of Mrs. Thompson, had the other keys. Witness occupied one room in the house as a shoe-shop. Mrs. Edmonds occupied the other three rooms. She was a tenant of Reid. A week or so after Reid's death, witness turned the key over to J. E. Thompson, defendant's husband, supposing that Thompson was temporary administrator of Reid, though Thompson did not say he

was taking charge as such. Mrs. Edmonds was then in the house and had been for some time. She was not holding under Thompson's wife. Thompson and wife immediately moved into the house. They had one of the rooms ceiled; furnished the lumber and had the work done. They have had charge of the house from that time to the present.

The testimony for defendant showed the following. In 1888 Estes of Fairburn procured Miles to go to Fayette county where Reid lived, to rent the premises in dispute from Reid for Estes. Reid was sick in bed. Upon Miles stating to him that he had come to rent the McKown place for Estes, Reid answered: "I have nothing more to do with the McKown place. I have given it to Maggie Thompson, J. E. Thompson's wife, and have no further control over it. You can see Jim Thompson. I suppose he can tell you anything you want to know." Miles returned to Fairburn and told defendant's husband what Reid said. Reid died on the next day. He was a bachelor, and for many years made his home at the house of Mrs. McDonald, the mother of defendant, and did so up to the time defendant married, which was seven or eight years ago. The place in dispute is worth $800 or $900. Mrs. Slaton, who was present at the time of Miles' visit to Reid, testified that she had heard Reid talk a great deal about defendant; he said he thought a great deal of her, and told witness he gave her the McKown place for what she had done for him and for what he thought of her; that defendant had been very kind and good in waiting on him, and he gave her the place for what she had done for him; that Maggie was going to move into the house as soon as she had some repairing done; that Jim Thompson had ordered the lumber to have the house repaired. This conversation about the lumber occurred a few days before Reid died. He lived in the house with Mrs. Slaton and

her husband for the years 1885, 1886 and 1887; did not live in the house with them in 1888, but she visited him in his last sickness and waited on him. She heard him say he lived in the house with defendant's mother a long time and defendant waited on him while there. Smith testified, that in the fall of 1888, a month or so before Reid died, he told witness in conversation that he had given defendant the McKown place; that she had waited on him, and he gave it to her for part pay for her service in waiting on him. Dr. Mobley testified, that he was Reid's family physician, and was told by Reid a short time before his death that he had given defendant the McKown place. Reid stayed with Mrs. McDonald for years before he died. Mrs. McDonald's family waited on him as if he were one of them. Witness had seen defendant waiting on him. After defendant married he made her husband's house his home. He became her godfather when she was christened. J. E. Thompson testified, that he did not get the key from Vickery as temporary administrator of Reid, but took it because his wife was then in possession of the house by her tenant Mrs. Edmonds. The key Vickery had was not the key to the main building, but simply an inside key to the door of the room that Vickery used for a shoe-shop. Mrs. Edmonds was then in possession of the house, and Vickery would sometimes go into that room where he had his shoe tools deposited. Mrs. McDonald testified, that Reid did not make her house his home regularly until after her husband died, but before that time he made it headquarters when he came about Fairburn. Her husband died in 1873, after which event Reid made her house his home regularly until her daughters married off and she quit housekeeping about six years ago. Reid and her husband were like brothers and very intimate. After her husband died she waited on, cooked, washed and ironed for, and

boarded Reid until her daughters got large~enough to do so, and then they helped her. He was treated just like one of the family. All he ever paid for the service was about ten dollars a year. The service and board were worth one hundred dollars a year. He would sometimes furnish a little meal, meat or wood, which all told would not amount to over $10 a year. He made her house his home from 1873 to 1884, and during that time both her daughters (defendant and Mrs. Edmonds) helped her to wait on him. The property in dispute is not worth over $600.

After verdict for the plaintiff, defendant moved for a new trial, which was denied, and she excepted. The grounds of the motion are, that the verdict is contrary to law and evidence; that the court erred in not allowing defendant to prove that she had made valuable improvements on the land in dispute by having the house ceiled at an expense to her of $50, " she offering to prove by competent witnesses that the improvements which she had made on the land in dispute were permanent and were made immediately after the death of Matthew Reid "; and that " the court erred in refusing to allow defendant to ask Mrs. S. A. McDonald the following question (written interrogatory) propounded to her: ' What did Matthew Reid ever pay you or your daughters for boarding and waiting on him, except the houses and lots he gave your daughters?' and in refusing to allow the following answers of hers to the above interrogatories to be read to the jury: ' They have not paid me anything nor he has not paid me anything, but gave my daughters the two houses and lots in Fairburn for our trouble.' "

ROAN & GOLIGHTLY, for plaintiff in error.

THOMAS W. LATHAM, *contra*.

LUMPKIN, Justice.

1. The facts appear in the reporter's statement. It

will be observed that the evidence fails to show that Mrs. Thompson was entitled to the land in dispute under a contract of purchase with the deceased, Mr. Reid. At best, her claim of title rests solely upon a parol gift, accompanied by possession, based upon a consideration which was meritorious and, perhaps, to some extent valuable. It is well settled law that this, of itself, would not be sufficient to pass title into Mrs. Thompson. It was insisted, however, that under the provisions of section 3189 of the code, she was entitled to the premises because of having made valuable improvements upon the faith of the gift. Although there is evidence to show that some of the materials for the making of these improvements were ordered during the lifetime of Mr. Reid, and that he knew of this fact, it is admitted that the improvements themselves were not made until after his death. In our opinion, therefore, the gift never became complete. It was within the power of the deceased to revoke it at any time before the improvements were actually made. He could have done this even after the materials for the improvements had been purchased. This being so, Mrs. Thompson could not complete the gift by making the improvements after his death. Inasmuch as it cannot be known that Mr. Reid would not have exercised his undoubted right of revocation before the improvements were made, his estate cannot be bound by anything done which he might have forbidden had he lived. Moreover, it does not appear that, by ordering or procuring the materials in question, any injury resulted to Mrs. Thompson. In no event would her claim of title, under the facts stated, have any shadow of legal merit, unless it had been further shown that, with the knowledge and acquiescence of the deceased, she had incurred some substantial loss because of the gift. We do not, however, confine the principle involved within these narrow lines, but we hold distinctly that the mere

v 92-19

procuring of materials would not put Mrs. Thompson's claim on any better footing, even if she made it appear that in case she had not used the materials in making improvements on the property in question, she would have been unable to dispose of them except at a sacrifice. Mr. Reid could have revoked the gift even after she had bought the materials; and although, subsequently to his death, she used the same in making substantial improvements upon the property, she thereby gained no greater right than she had during his lifetime.

2. There was no error in rejecting the answer to the interrogatory referred to in the second head-note, and which is set out in full in the reporter's statement. It was plainly and manifestly leading. It assumed the existence of a collateral fact of vital importance to the issue then being tried, and suggested the answer desired; and the answer as given necessarily tended to establish incidentally the existence of this fact. Presumably, the objection to the interrogatory as leading was made in writing and at the proper time, because, in endeavoring to sustain the admissibility of the answer counsel did not make it affirmatively appear,—nor, indeed, was it even suggested,—that the objection was not made as required by the rule of court which prescribes that no exception to a written interrogatory, on the ground that it is a leading question, shall prevail unless it be filed with the interrogatories before the issuing of the commission.

3. The verdict was sufficiently sustained by the evidence; no error of law was committed by the court, and the motion for a new trial was properly overruled.

*Judgment affirmed.*