Note.—See under (1) Workmen's Compensation Acts C. J. p. 73 § 64; anno. L. R. A. 1916A, pp. 40, 232; L. R. A. 1917D, 114; L. R. A. 1918F, 896; 28 R. C. L. p. 801; 3 R. C. L. Supp. p. 1596; 4 R. C. L. Supp. p. 1856; 5 R. C. L. Supp. 1569.    (2) Workmen's Compensation Acts C. J. p. 124 § 131. (3) Workmen's Compensation Acts C. J. p. 125 § 131.

---

**HELDT v. HELDT.**

No. 16061—Opinion Filed Jan. 12, 1926.

Rehearing Denied May 25, 1926.

1. **Specific Performance — Refusal Where Contract Terms Uncertain.**

It is a well-settled principle that specific performance of a contract will not be enforced when any material part of the terms or conditions is uncertain. Staik v. Roetzel, 46 Okla. 695, 148 Pac. 1017.

2. **Appeal and Error — Review of Equity Case—Sufficiency of Evidence.**

In an equity case, where the defendant has demurred to the testimony of the plaintiff and the court has rendered judgment for the defendant after weighing the evidence, the judgment of the trial court will not be reversed, unless against the clear weight of the evidence. Penny v. Vose, 108 Okla. 103, 234 Pac. 601.

(Syllabus by Threadgill, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Noble County; Claude Duval, Judge.

Action by Ben Heldt against Gotfreidt Heldt for specific performance of contract. Judgment for defendant, and plaintiff appeals. Affirmed.

H. A. Johnson, for plaintiff in error.

Cress & Tebbe, for defendant in error.

Opinion by THREADGILL, C. On July 29, 1922, plaintiff in error as plaintiff commenced this action in the district court of Noble county against defendant in error as defendant to enforce specific performance of a verbal contract. The parties will be referred to as they appeared in the trial court.

Plaintiff alleges, in substance, that he and defendant entered into a verbal agreement October, 1911, by which defendant sold him the S.½ of N. E. ¼ of sec. 21, T. 2 N., R. 1 W., Noble county; that he agreed to pay $2,000 for the property as follows: Assume and pay off an $880 mortgage on the land, and the balance of $1,120 to be paid when they should mutually agree to sell the land. He further stated that he had paid defendant $672 on the balance of the $1,120; that the defendant turned over to him the possession of the premises by virtue of the contract, and he had held the possession and control of the premises ever since; that the record title stood in the name of defendant, and he was threatening to sell the same to other parties, and refused to complete the sale to him by executing to him a deed; that he had performed his part of the contract and is ready to do all things necessary to obtain the deed. Whereupon he prayed for specific performance. On September 5, 1922, defendant filed an answer and cross-petition. The answer consisted of a general denial and the cross-petition states that he was in possession of the premises, and plaintiff is interfering with his quiet enjoyment of the property, by entering upon the premises and destroying fences and other property, and will continue to do so unless restrained from so doing; that the plaintiff is asserting ownership to the said land under an alleged contract, as stated in his petition, and asserting his right to possession, and will continue to do so unless restrained from so doing. Where-

upon he prayed for an injunction against the alleged trespass and claims of plaintiff and asked that the title to the property be quieted in himself and against all and any rights claimed by plaintiff and for general relief. There was a reply consisting of general denial.

On May 17, 1924, the issues, as thus joined, were tried to the court, and when, plaintiff introduced his first witness, being himself, defendant interposed an objection to the introduction of any evidence on the ground that the petition did not state facts sufficient to constitute a cause of action for specific performance. The objection was overruled and exception taken. The witness proceeded to detail the terms and other matters connected with the contract he relied on, and in substance testified as follows: He said that about October 9, 1911, about two days after his mother's death, the defendant, who was his father, came to him and offered to sell the place to him as well as his personal property, farming implements, machinery, cattle, household goods, and everything. The price for the place was $2,000. They agreed that he was to assume a mortgage on the place of $800 with $80 commission, and pay the same, and the balance of $1,120 he was to pay in the future at such time as they both agreed to sell the place, and, if they never agreed to sell it, he would not have to pay it. But he was to pay six per cent. interest on it, and he was to pay $825 for the personal property, $500 of which he paid in cash, and he was to provide a home for his father, that is, his father was to live with him. He stated that his father said he would hold the deed because he thought he might not be able to pay off the mortgage when it fell due, and said he would draw a will for plaintiff's protection. Plaintiff objected to this for the reason the other children might give him trouble, and then his father agreed to give him a contract or sufficient papers to make him safe, and he says he then took possession of the premises and everything. His father, upon his suggestion, made a visit to see one of his daughters, and stayed three months and without any expense to plaintiff. After the visit he returned to plaintiff's home and stayed there until the latter part of February, 1912, and because he did not like plaintiff's wife, he wanted to go and live in the Lutheran's Old Home, and wanted him to pay the expenses, but he raised objection to this and persuaded him that he should not go, and then his father lived on the place in controversy and kept "bach." The court asked him when this was, and he answered in the spring of 1922. "He came in the fall, Sep-

tember, 1921; this was the spring; this must be February, 1922—this was February when this was." In the course of his testimony he tells of various trips he made to visit his daughter and was out of the state; then the witness tells how his father became dissatisfied with living by himself, and he learned that he had offered to sell the place for $4,000, and he asked him why he did this, and called his attention to their agreement, and his father said he had not paid him anything for four years, and the witness then showed him certain checks indorsed by him and he acknowledged them and said his memory had failed him, and these exhibits were admitted as evidence. The witness then tells that he took possession of the premises, back in 1911, and made certain improvements on the premises, and material and labor on the house cost the sum of $350, and his own labor was $75, all in the spring of 1912. He further stated he paid interest to his father on the $1,120 in the sum of $67.20, and interest on the $800 mortgage every year, and $160 commission, and paid the taxes and insurance, and the whole sum paid by him amounted to $1,850 except taxes and grocery bills and clothing. Said the taxes were from $35 to $54 a year, $54 was the highest paid, which was in war time. On cross-examination he said his father had six living children. Said the $1,850 above mentioned did not include the $500 cash he paid at the time the contract was made. He said he put a hen house on the place, which was 10x12 feet, valued at $50. The $500 he paid was in money, not check, and he got the money from a man by the name of Garvin, who is now dead. Said he gave his father a note for $325 at the time he bought the personal property, and gave him another note for $171 for unpaid interest on the $1,120. The $325 note disappeared from his father's trunk in 1925, and he gave him another $325 note to take its place. The lost note was dated in 1911 and bore six per cent. interest, but he had never paid any interest on it because his father did not want any interest. He then stated the first note was to bear no interest and he did not know when it was due. He farmed the place, but he lived about five miles from it. The house he made the improvements on was a two-room house. He put a rock foundation under it at a cost of $35; put sidings on it for $30; shingles for $35; paint $7.50; and concreted the well, and other small things at $10, and built a granary for $85. The land was worth for rental purposes $2 per acre. His father gave an oil and gas lease, by his consent, on 70 acres of the land, and he collected the bonus which

was $875, and the rentals for three years thereafter at a dollar an acre amounting to $210. During the ten years from 1911 to 1921, he said he paid interest to his father in the sum of about $480. He paid the taxes, $287.14, $160 commission, insurance $115, making $1,033.14. The average rental value of the land for 11 years at $160 a year would be $1,760, and the oil and gas bonus $1,085, making a sum of $2,845. The plaintiff then rested his case, and defendant demurred to the evidence, and thereupon the court called the witness and further interrogated him, and the substance of the evidence was as follows: He bought the land at $2,000 and he had paid $120 a year interest; assumed the $880 mortgage and had paid the mortgage off which left $1,120 to be paid his father. Under the contract he said he was to pay this $1,120 whenever he could. His father wanted to hold the deed to save the expense of an abstract and after the mortgage was paid off he was to issue a deed and he was to pay the balance of the $1,120. He owed the $1,120 at the present time, but said nothing about paying it. The mortgage was to be paid first, and commission, and when he was able he was to pay the $1,120. There was no note for the amount. There were no writings except what was written in the will. The only excuse for not getting the deed was the extra expense of the abstract. It was agreed that in case of his father's death he was not to pay anything of the $1,120. The examination continued further as follows:

"Q. Then this was your oral contract, that you was to pay him $2,000 for the place and assume the mortgage of $880 and was to pay him $1,120 when he gave you a deed, and if he died without giving you a deed you wasn't to pay anything? A. No, that was the agreement. Q. How did you figure you would get the title? A. He claimed I could get it through the will, it would be my protection, that was what I was trying to convince him that it wouldn't protect me. Q. Well, did you complete your contract, were you trying to make a contract, or complete one you had made? A. To complete one we had made; I agreed to pay him $1,120 before I ever got into trouble. I agreed to pay him $1,120 and will yet. Q. Well, you say you demanded a deed of him at one time, in 1913, you say? A. I demanded it the first time when he made the deal, and then the next time when he came down to visit me in 1913. Q. Did you tender him the $1,120? A. I offered to pay off this $800 and give him at that time a first mortgage on the place for the full amount of $1,120. Q. Well, that wasn't according to your original agreement that he was to take a mortgage, he didn't agree in the first instance to take a mortgage? A. No, he

didn't agree in the first time; he was just going to hold it until I had paid off the $800 and then he was going to give me a deed and I was to pay him the $1,120. Q. When? A. Whenever—we agreed — whenever I could raise money to pay him off. Q. And if he died without you raising the money, then you didn't have to pay it at all? A. That is the way we agreed. Q. It was to your interest to never pay it? A. It would have been to my interest, but I had been offering to pay it and he wouldn't accept it. Q. If you got a deed in his lifetime, then you would have to pay the $1,120; if you didn't get a deed you wouldn't have to pay it; you didn't really want a deed? A. I wanted the deed to protect myself from the other children, that is the reason I would rather pay the $1,120."

At this point counsel for plaintiff asked leave to amend the petition to allege the contract between the parties in conformity with the evidence, that is, to conform to the evidence as brought out in the examination by the court. This was objected to and the court inquired what he claimed the contract to be upon which he desired to base the amendment, and he answered:

"We claim that any time the plaintiff might be ready to pay the balance agreed to execute a deed conveying the land in question to the plaintiff; that in case the defendant should die before the $1,120 be paid, in that event, the plaintiff was to be relieved of paying it altogether."

This was objected to on the ground that this evidence and amendment proposed were at variance with the former petition and evidence of plaintiff, and would be adding uncertainty to uncertainty. The amendment was permitted, and defendant's demurrer being renewed, the court sustained the demurrer and denied the relief asked in the petition and rendered judgment in favor of defendant, giving him a permanent injunction against the plaintiff. From this judgment plaintiff has appealed and urges one proposition, to the effect that the contract supported by the evidence was not sufficient to take it out of the statute of frauds, requiring contracts involving title to real estate to be in writing, and it was error for the court to sustain the demurrer to the evidence and dismiss the cause of action; citing the cases of Fulp v. Sill Mfg. Co., 101 Okla. 226, 224 Pac. 694; and Fulkerson v. Mara, 68 Okla. 272, 173 Pac. 811. Counsel quotes the rule relied on as follows:

"An oral contract for the purchase of real estate, where part payment of the purchase price has been made and the vendee goes into possession of said property in good faith and makes valuable improvements thereon, takes the contract out of the statute of

frauds, and is such a performance of contract as to warrant a court in directing specific performance of the **contract."**

This is the general rule in all cases where the sale of real estate is based upon an oral contract. But, can we say this rule is applicable to the case under consideration? Plaintiff in his first amended petition alleged that the contract was to pay $2,000 for the land by assuming an $800 mortgage against it, and the balance, $1,120, to be paid defendant when he and the defendant should agree to sell the land, and if they did not agree to sell it, then at any time he "wished" he could pay the balance and his father should execute a deed and deliver the same to him. After the court examined the witness, as above stated, counsel for him asked leave and was permitted to amend the petition to show that the agreement was that at any time plaintiff might be ready to pay the balance of $1,120, at such time the defendant agreed to make him a deed, but in case defendant died, then plaintiff was not to pay anything. This amendment was according to the last testimony of the plaintiff. We cannot see where this testimony and amendment are of any assistance to plaintiff's cause. According to the evidence he never paid his father one cent on the purchase price of the land; did not even give him a note for it. There is nothing to show what he meant by being ready to pay, but whatever it means, there is nothing to show that he ever offered to pay the purchase price, either the mortgage or the $1,120. If the word "ready" means willing to pay, there is nothing in the contract as stated by plaintiff to show how it was to be manifested. He might be willing without offering money. He says he often asked for the deed, but he confesses he never offered the money before filing his suit in court. At the time he filed his suit, according to his petition and amended petition, he paid cash on this $1,120 in the sum of $672, but in his evidence he confesses that the payments made at that time were for personal property and not on the land. It appears from the evidence and the last amendment to the petition, that all plaintiff had to do, under his agreement, was to keep himself in a ready state of mind to pay, and if his father died before he did, he was not to pay the $1,120, and yet he was to have a deed either before or after defendant's death. We are unable to find from the evidence that plaintiff ever paid off the mortgage or that he was in possession of the premises to the exclusion of his father, or that there was an enforceable contract between the parties, and we are, there-

fore, unable to say the judgment of the trial court is against the weight of the evidence.

"It is a well-settled principle that specific performance of a contract will not be enforced when any material part of the terms or conditions are uncertain." Staik v. Roetzel, 46 Okla. 695, 148 Pac. 1017.

Another rule by which this case is governed is that:

"In an equity case, where the defendant has demurred to the testimony of the plaintiff and the court has rendered judgment for the defendant after weighing the evidence, the judgment of the trial court will not be reversed unless against the clear weight of the evidence." Penny v. Vose, 108 Okla. 103, 234 Pac. 601.

We are, therefore, of the opinion that the judgment of the trial court is correct, and should be affirmed.

By the Court: It is so ordered.

Note.—See under (1) 36 Cyc. p. 588; anno 2 L. R. A. (N. S.) 221; 22 A. L. R. 1055; 25 R. C. L. p. 218; 4 R.C. L. Supp. p. 1575; 5 R. C. L. Supp. p. 1315. (2) 4 C. J. p. 904 § 2873 (Anno) ; 2 R. C. L. p. 202; 4 R. C. L. Supp. p. 91.