**NOLAN v. MATHIS, Adm'r, et al.**

No. 18703. Opinion Filed Oct. 2, 1928.

Rehearing Denied Dec. 24, 1928.

John J. Carney, W. H. C. Taylor, J. T. Johnson, and Walter Marlin, for plaintiff in error.

Drennan & Drennan and Sam P. Ridings, for defendants in error.

BENNETT, C. John Nolan, about 60 years old. died intestate at his home in Lamont, Okla., May 19, 1924, leaving as his only heirs at law certain brothers and sisters, parties to this suit. Harry W. Mathis is administrator of said decedent.

Decedent left a considerable estate composed of several farms, a grain elevator, and $8 000 or $10,000 worth of personal property; the entire estate would perhaps aggregate $50,000 or $60.000. Immediately following the death of said decedent, his three brothers, Michael, Patrick, and Thomas, took possession of and appropriated to their own use about $7,000 worth of personal property and practically all of the real estate belonging to said decedent under the claim that decedent had made an oral gift to each of said three brothers of certain farms, and also all of the personal property. Thereafter each of said brothers brought suit against the other heirs of John Nolan. deceased, and his administrator, to quiet title in the land claimed by him. The administrator brought suit against said three brothers for conversion of personal property of the estate and recovered judgment for more than $7,000. Suit was brought against the administrator by Michael Nolan for $20,000, damages for interfering with the possession of the real estate so claimed by him. and for more than $2,000. the tenant's share of the crop raised on said premises for the year 1924, and alleged to have been wrongfully taken by the administrator.

John Nolan was an alert, shrewd, active business man, and accumulated by his own efforts his fortune, and all of the brothers and sisters of decedent lived round about him, and there is no proof that there was any enmity or ill-will between them and decedent.

In 1922 John was stricken with paralysis, and for two or three months was unable to take care of himself, but later was able to overlook his farms and take an active interest therein, though he was less active than formerly. In December, 1923, he went to Marlin, Tex., and later to Mineral Wells, Tex., for his health, but remained only a short time. During decedent's sickness he was given such attention as he required, principally by Michael Nolan and Amelia, his youngest sister. Some attention was given him also by his other two brothers and perhaps others of the family. Michael gave attention to the management of some of decedent's farms during 1923. Michael lived only a short distance from decedent, and neither Michael nor John had ever married. While at Mineral Wells in February, 1924, John suffered another paralytic stroke, and upon request said brothers and said sister attended him there. He was not entirely helpless at this time, but was able to walk about with assistance, and a short time later he was carried to his home in Lamont where he died within about two months. For a few weeks before his death he required considerable attention as he was not able to look after himself. These brothers gave him such attention assisted by Amelia and nurses:

Soon after John's death the three brothers approached their sisters to ascertain if they would be willing to carry out the will of decedent. This approach was upon various occasions and under different circumstances, and received answer, in substance, that if decedent had made any will the same should be disclosed to them, so that they might determine for themselves their course, and that if it were a legal will they would have to be bound by it. So far as the proof goes, these three brothers, or some one of them, were with John most of the time from the time of his stroke in Mineral Wells until his death. The proof does not indicate that any of the other heirs had any knowledge of the alleged gift of real or personal estate made by decedent to the three brothers until the institution of several suits based thereon. It thus appears that this estate is subject to exhaustive, if not exhausting. litigation; and the case at bar is the suit of

Michael against his other brothers and sisters to enforce the oral gift claimed from decedent and to quiet title in plaintiff as against said brothers and sisters and the administrator of said estate as to the real estate known as the Blaisdell and the Mabry farms, which lands are of considerable value, one of said tracts being appraised at $14,000, but subject to a mortgage of $5,000.

The original petition was in the usual form in actions to quiet title, and alleged as the basis of title of plaintiff that in consideration of blood relationship, close business association and an agreement between Michael and John, made years before, the survivor of them should take all the property of the one dying first, and also by reason of the fact that Michael had attended him during his illness; that John, in February, 1924, and again in April, of the same year, when in dire physical distress and apprehensive of death, orally gave to Michael the two said farms, and also the personal property hereinbefore mentioned; and that Michael accepted such gifts, and thereafter, on April 15, 1924, entered upon said real property and made permanent improvements thereon in reliance upon said gift, and on which account he asked that title be declared and quieted in him. After a demurrer was filed to the petition and sustained, a first amended petition was filed substantially the same in form and substance as the first, but adding that one of said farms was purchased with partnership money which belonged jointly and equally to John and Michael. Later a second amended petition was filed in deference to a successful demurrer interposed as to the first amended petition. The second amended petition followed in substance the original and first amended petitions, but added to his charging paragraph therein:

"That this plaintiff, therefore, claims an equitable interest in said real estate by reason both as a gift and the fact that he was a joint and equal owner of the money used to purchase said real estate."

The answer of defendants, after general denial, set out the relationship of parties, ownership of the real estate in John Nolan before his death, the administration on the estate, and followed with an allegation that these three brothers had conspired and fraudulently confederated together to absorb and personally take over the entire estate, both real and personal of John Nolan, deceased, and to claim same either by gift, purchase, or under a resulting trust, just in such manner as best suited their unlawful designs, and that each would bring suit to quiet title to the property so taken by him, and that, acting under this arrangement, they brought the suits, took possession of the property, converted the personal estate, and falsely represented, in effect, to the four sisters that John Nolan left a will, and that this was simply a scheme to influence the other heirs of the estate to either make title to said three brothers or to allow their interests in the estate as claimed to be quieted.

Patrick Nolan and Thomas Nolan filed disclaimers saying that they on the —— day of May, 1924, conveyed to plaintiff all their rights in the premises. The evidence is largely by deposition. The substance of same is reflected in the following excerpts:

Robert L. Bossell, aged 59, Mineral Wells, Tex.: Witness met John Nolan at Mineral Wells, Tex., February 11, 1924; that Mr. Nolan was very sick and wished to have his brothers and his sister Amelia called at once. The sick man said that he had plenty of money to pay his debts and witness for his trouble; that his little sister Amelia would be wealthy at his death; that his brothers would have plenty, and that if he should die that he wanted his brothers and sister Amelia to have all his property. Witness has been nursing on and off for 20 years at Mineral Wells.

Thomas F. Hunter, Perry, Okla.: Witness saw John Nolan about March 19, 1924. He was weak and sick at the time. Witness asked Mr. Nolan what would become of his property if he should die. He answered that he had that fixed and that his brothers Michael and Tom and another brother, whose name witness could not recall, would get all he had. These brothers were with John Nolan at the time.

J. P. Brady, aged 23, Clinton, Okla.: Heard several conversations between John Nolan and Michael Nolan in 1923 with reference to the land in controversy. John told Michael that he wished him to take charge of the place and work it as if it were his own place.

Charley Smith, residence, Oklahoma City: Witness worked on the Blaisdell place in 1923 and 1924; repaired implements, rakes, double trees, etc. Worked about ten days or two weeks at the instance of Mike Nolan. Did not do any work on the repairs on farms in 1923, but perhaps did some of that kind of work in August, 1924. Witness did some repair work on the farm after the death of John Nolan, painted the house and did some

other small repairs on the Blaisdell place, he thinks, in June, 1924.

A. T. Clark: After January, 1924, witness went to John Nolan's house to help nurse him. A few days after Mike and John returned from Mineral Wells witness heard John say he had given the south place to Mike and intended to make him a deed for it to pay him for his time and effort spent in caring for him while he was sick.

Francis E. Sumpter: Witness sowed wheat on the Mabry and Blaisdell places in 1923 during which time he saw John Nolan one-half dozen times on the farm and heard him say he (John) owned the farms, and that he was going to give them to Mike because he had been kind to him.

John B. Miller: John Nolan told witness that he had things fixed so that Mike would get everything except the house and that his sister would get that. That John Nolan was a very shrewd and smart business man.

Jim Carter testified that he heard John say in December, 1923, that Mike had been good to him, and that he was going to let him have that place for what he had done for him.

Michael Nolan, 59 years old, plaintiff: In 1923 witness put the Blaisdell place in wheat and handled the alfalfa thereon. Was in possession of same in 1924. Took possession of same under an agreement with John Nolan. Before May 19, 1924, when John Nolan died, witness was in possession of house and farm. Witness released his one-half of wheat crop in 1924 to pay taxes on the property. Has paid some taxes and some interest since that time.

Cross-examination: That he put wheat on the lands in 1923; at that time was working the same in shares, that is, witness was to give John Nolan one-half of the wheat. The balance belonged to witness. Witness brought suit in case No. 3651 in district court of Grant county against Harry W. Mathis, administrator, and that the petition in said cause contains the following statement:

"That the defendant, Harry W. Mathis, is the duly appointed, qualified and acting administrator of the estate of John Nolan, deceased. That at all times hereinafter mentioned, the plaintiff was in possession of, under and by the terms of a verbal lease, the following described real estate in Grant county, Okla., to wit: About 60 acres off of the north side of the southwest Quarter of section 6, in township 25 north, range 3. W. I. M., covering the north fractional

80, and some additional on said quarter adjoining thereto, also the southeast quarter of section 1, in township 25 north, range 4, W. I. M. That by the terms of said lease, the plaintiff was to furnish all of the seed oats and barley and put in the crops upon said premises, harvest the same, pay one-half of the threshing bill, and deliver one-half of the same at the elevator for the said John Nolan, the other one-half of the crop to belong to the plaintiff, which included about 35 acres of alfalfa. That in April, 1924, the said lease was by mutual agreement between the plaintiff and the said John Nolan, extended for the entire year 1924, and to include the whole southwest quarter of said section 6."

Witness says that before the death of John Nolan, the only improvements made by him were straightening up around the house, cleaning up the rubbish, removing a tree which had blown down and rolling up some old fence wire. Witness released one-half the wheat on the place to pay taxes for the year 1924.

"Q. According to your petition there the estate was entitled to half of that wheat, wasn't it? A. Yes, sir, I was to give him half of the wheat. * * * Q. And the half that was released to Mathis was the half that you admitted he was entitled to? Isn't that right? A. I surrendered for that purpose.

Thomas Nolan: Was often around John Nolan during his sickness. Michael, Amelia, Patrick Nolan and witness cared for him. Michael spent more time than the others. Had nurses and doctors with John. It was about two or three months after the stroke before he was able to take care of himself. Had second stroke about April 7, 1924, while in Texas. After he was stricken Mike had charge of Blaisdell and Mabry places. Patrick was in charge of homestead and witness was in possession of the Chrissler place. On December 26, 1923, witness heard John say he wished witness to give Amelia the keys to his home in Lamont. Witness had one of the keys and Michael had the other. John was then preparing that day to go to Marlin, Tex. The keys were turned over to Amelia. Previous to that he had tried to get the Woodmen organizer to turn over $500 insurance to her. John Nolan stayed in Marlin about three or four weeks, and then came back to Lamont. Amelia was in possession of the house while he was gone. John went back to Texas later, and witness went to Mineral Wells the 18th of February, 1924. At that time witness heard John Nolan say he wanted Mike to have the Blaisdell and Mabry places and Patrick to have the homestead and Amelia to have the house and

lots. He said that Mike was a good brother and he wanted them to have the different places for what they had done for him. He says, "I owe you boys large sums of money and I want you to be good to me and stay with me to the end, and I want you to be good to Amelia." After a short time we came back to John's home in Lamont where he remained until he died. While at Lamont he said to Mike that he wanted him to take the Mabry and Blaisdell places, and that he owed him large sums of money; that he wanted Patrick to have the homestead and Amelia to have the house and lots and the Woodmen insurance. John told witness that he did not think he would live, and seemed to want to repay the money and attention given him, and wanted him to stay with him to the end, and Mike said, "I will stay with you and will accept your offer."

Cross-examination: Witness has a suit pending in Kay county for the quarter section of land against the administrator and witness' sisters.

"Q. And your two brothers here, you and your two brothers here appropriated practically all the personal property of this estate after your brother's death, didn't you? * * * A. Yes, sir; what we got of it. Q. And a judgment has been rendered in this court for $7,452 against you three brothers for that personal property, has it not? * * * A. $6,388, and some interest you claim; yes, sir. Q. Amounted to $7,452, doesn't it? A. I believe something like that amount."

Witness says that he supposes Amelia took the keys because it was necessary for her to have same as she was going to stay at the house during John's absence. Witness would suppose the house worth $3,000, but Amelia never got the house. The house was bought by John for $700, but in the estate it was appraised at $1,200; that the Blaisdell place was worth $14,000, and the Mabry place $6,000.

"Q. Now, you had a conversation you say at Mineral Wells with John in which he said that he wanted Mike to have these two places? A. Yes, sir. Q. Did he say why he didn't make deeds to him for them? A. Well, he said he would. Q. He was going to then? A. Yes, sir. * * * Q. Why was he going to make it? A. Because he wanted to do that way."

That was in February, 1924, and John lived until the 19th day of May.

"Q. And he spoke about making deeds and didn't make them? A. That's right."

The Blaisdell place is encumbered for $5,000, and the same on the Mabry place.

Patrick Nolan: Testified to the same state of facts as Tom Nolan with reference to disposition of the property, and fixes the date as about April 5, 1924.

Cross-examination: Witness has a case pending against the administrator and heirs of John Nolan for John's homestead. Was a party to the suit wherein the administrator recovered $7,452 for personal property taken by the three brothers from the estate of John. The first time John was stricken he was disabled about a month, and then could get out and get about. He would drive around over his places in a car. Witness heard John say when he was first stricken in April, 1922, something about the property. John wished witness to write a will for him, but witness told him he could not write very well, and that John said he would write it himself. Then he wrote that down and read it, and he told witness he would give the Blaisdell and Mabry places to Mike and the Chrissler place to Tom and the homestead place to witness and house and lot to Amelia.

"Q. Made a will did he? A. That's what he done. Q. Where is that will? A. I don't know where it is. Q. Then he was preparing a formal way of turning this property over, was he? A. It looked like it. Q. You know there has never been any will produced here, don't you? A. I do."

Michael Nolan, recalled, testified that Bert Donaldson was renting the Mabry place from John Nolan for the year 1923, and was living in the house on the place, and that he had occupied said place continuously since that time and is living there now.

The petition in cause No. 3651 referred to above declared in the eighth paragraph:

"The plaintiff by reason of being the owner of one-half of the said wheat is the owner of one-half of the said money now in the hands of the court clerk of this court, and is entitled to an order of this court directing and commanding the clerk to pay the same over to the plaintiff."

And in paragraph 6 says that the defendant interfered with plaintiff's right to deal with the grain under and according to the terms of the lease under which he held the property, which lease is referred to in paragraph 4, wherein it is said that the said lease by mutual agreement between the plaintiff (Michael Nolan) and the said John Nolan was, in April, 1924, extended for the entire year 1924, and to include the whole southwest quarter of said section 6. These same allegations are reiterated in the second and third causes of action in said petition.

At the conclusion of plaintiff's evidence,

defendants interposed a demuurrer thereto, which was, by the court, sustained, and from which this appeal is prosecuted by plaintiff. The parties will be referred to as plaintiff and defendants, the order in which they appeared in trial court.

Plaintiff in his brief has set out numerous contentions, to which attention will be drawn later, but we think that the real determinative issue in the cause is whether or not the court committed error in sustaining the demurrer.

Pertinent to this inquiry it is proper to determine what the nature of this proceeding is. The plaintiff says in this original petition that John Nolan, on February 23, 1924, while in great physical distress and weakness at Mineral Wells, Tex., gave plaintiff the Blaisdell and Mabry places, and that plaintiff as to the gift said, "I will accept the gift," and that later, to wit, on April 5, 1924, about the same language was used by John Nolan to plaintiff after their return to Oklahoma, and paragraph 13 of the original petition reads as follows:

"Plaintiff further alleges that the equitable interest in the said real estate herein described was transferred to him by his said brother, John Nolan, because of the long continued, intimate personal relations which existed between him and his said brother; but more than the personal and blood relationship was and is the fact this plaintiff had devoted tireless attention; had given months of his time, and spent a large amount of money in the interest of his said brother during his long continued illness."

And in paragraph 15 the plaintiff says:

"That under and by virtue of the gift of the said real estate to him by his said brother, he took possession of all of said real estate as the owner thereof, on or about April 15, 1924; that he has held possession of said real estate from the 15th day of April, 1924, until the present time, under claim of ownership and title thereto, and is in possession thereof, at the time of the commencement of this action."

Paragraph 12 of the first amended petition reads as follows:

"Plaintiff further alleges that the said real estate above described was given to him by his said deceased brother, John Nolan, for and on account of the facts above pleaded, which facts here more specifically stated are as follows:

"(a) Because of blood relationship.

"(b) Because of the long continued and intimate association in a business and social way between plaintiff and his deceased brother.

"(c) For the reason that plaintiff herein devoted his time, his energies and his money in an effort to restore the health of his said brother during the illness which preceded the death of his said brother.

"(d) For and on account of the fact that the joint funds of this plaintiff and his deceased brother, John Nolan, were used by his said deceased brother, John Nolan, to purchase said real estate; and that said gift was made in compliance with the understanding between plaintiff and his now deceased brother at the time said joint funds of plaintiff and his deceased brother were used for the purchase of said real estate. * * *"

And later, in the second amended petition, plaintiff alleges :

"That he claims right to the title and possession of said real estate above described by reason of the gift made to him by his said brother, John Nolan, supported by the facts and reasons for making said gift, and for and on account of the further fact that the said real estate above described, and which this plaintiff now claims as his own, was purchased by the joint and equal funds of this plaintiff and the said John Nolan, deceased; that this plaintiff, therefore, claims an equitable interest in said real estate by reason both as a gift and the fact that he was a joint and equal owner of the money used to purchase said real estate."

The legal title to this property always remained in John Nolan. The only reasonable construction, we think, that can be placed upon the allegations of plaintiff is that he claims these lands under an oral gift from his sick brother who was the owner of the title. The numerous allegations as to services rendered and close association are simply matters of inducement for the gift upon which plaintiff relies.

The claim in plaintiff's brief that he is the equitable owner of this land by reason of a resulting trust arising from his furnishing a part of the purchase money is clearly inconsistent with his claim of same by reason of gift. If the land belonged to John Nolan, it did not belong to Michael; and if it belonged to Michael Nolan, John Nolan could not give it away. It is entirely inconsistent with the fact that since the date of purchase (1912), this land was held and its rentals enjoyed by John without a word of protest by Michael; inconsistent with a renting of the premises by Michael from John for the years 1923-1924; and inconsistent with plaintiff's suit in 1925 against the administrator for a tenant's share of the crop.

After demurrers were sustained to the or-

iginal petition and amendments, there is a change of front attempted by plaintiff, and there appears for the first time the allegation that plaintiff claims an equity for having furnished a part of the purchase money.

"Where a party to an action makes a solemn admission against his interest in a pleading, in the absence of mistakes on his part, or on the part of his counsel who inserted them in such pleadings, a court, in passing upon the sufficiency of a subsequent amended pleading filed by him, should take such admissions into consideration and treat them as admitted facts in the case." John L. Page v. Guiser Manufacturing Co., 17 Okla. 110, 87 Pac. 851.

See, also, Land Implement Co. v. Lowder et al., 11 Okla 61, 65 Pac. 926; Bank of Buchanan County v. Priestly, 87 Okla. 62, 209 Pac. 412.

It is significant also to observe that nowhere in the pleadings, in the evidence either of plaintiff himself or of his witnesses, is there any statement that one-half of this land belonged to the plaintiff. In all of the statements alleged to have been made by John Nolan, deceased, there is no semblance of a representation that the plaintiff owned an undivided one-half interest in the property, either as a legal or equitable owner, or that John Nolan owned any less than a fee simple title absolute to the whole, and he so dealt with same, even with plaintiff himself. It is significant also that practically all the testimony is directed towards the proof of an absolute oral gift of the whole estate by said decedent. We are clear the petition was based upon whatever rights the plaintiff obtained under an alleged oral gift of this real estate. The petition does not disclose that it was filed for the purpose of having a trust declared in real estate, nor does the evidence, when taken as a whole, tend to support that contention. We have then the question: What is necessary to constitute an enforceable gift of land by parol?

"The general rule is that a parol gift of land is invalid and ineffectual to pass title to the donee (Collins v. Johnson, 57 Ala. 304): and this is true even where the gift is accompanied by possession (Pryor v. Newson, 144 Ark. 593, 223 S. W. 21), unless such possession is adverse as against the donor, and continues without interruption for the statutory period, or unless after taking possession the donee makes permanent and valuable improvements." 28 C. J. pp. 655-6.

"The general rule is that a parol gift of land, accompanied by possession by the donee, will be enforced in equity, when the donee has been induced by the promise of the gift to made valuable improvements to the land, of a permanent nature, and to such an extent as to render a revocation of the gift unjust, inequitable, and a fraud upon the donee. (28 C. J. p. 656, par. 57, note 49; citing cases from most of the states of the Union.) * * * It must be shown, however, that possession was given and taken in pursuance of, and in reliance on, the gift, with the knowledge and consent of the giver. (Citing Ellis v. Dasher, 101 Ga. 5, 29 S. E. 268); and that such possession was exclusive. (Citing Steinman v. Clinchfield Coal Corp. 240 Fed. 561, 153 C. C. A. 365; Altgelt v. Escalera, 51 Tex. Civ. App. 108, 110 S. W. 989). Moreover, in order to give the donee the benefit of this rule, the expenditures must have been made during the lifetime, and with the acquiescence, of the donor, upon the faith of the gift. (Citing Logue v. Langan, 151 Fed. 455; Burris v. Landers, 114 Cal. 310, 46 Pac. 162.) * * * The improvements so made must be of material and substantial value, having relation to the value of the land. (Citing Logue v. Langan, supra; Burris v. Landers, supra; Thaggard v. Crawford, 112 Ga. 326, 37 S. E. 367.) Slight and temporary improvements, or trivial outlays made to suit the taste or convenience of the occupant, do not raise an equity in favor of the donee." (Citing Bigelow v. Bigelow, 93 Me. 439, 45 Atl. 513; Altgelt v. Escalera, 51 Tex. Civ. A. 108, 110 S. W. 989.) 28 C. J. pp. 656-7.

To the same effect, see 12 R. C. L. 939-940, where it is held:

"Mere possession and the making of some improvements do not dispense with the necessity of producing distinct proof of the principal fact, that is, that there was a gift, and even if there was actually a gift, the donee is not entitled to the aid of equity when the improvements are slight and not of permanent value. * * * To constitute a gift, it must clearly appear that the intention was to transfer a present title."

In the case of Thompson v. Ray, 92 Ga. 285, the syllabus is as follows:

"A parol gift of land, accompanied by possession, based upon a consideration meritorious and to some extent valuable, is not * * * sufficient to pass title to the donee, nor will the making of valuable and permanent improvements upon the property after the death of the donor complete the gift, although the materials for such improvements may have been ordered during the donor's lifetime, and with his knowledge. It is within the power of the donor to revoke the gift at any time before the improvements are actually made and the gift thereby completed, and the donee has no right to complete the gift after the donor's death."

Section 5240, C. O. S. 1921, is as follows:

"No deed, mortgage or other conveyance relating to real estate or any interest therein, other than for a lease for a period not to exceed one year, shall be valid until reduced to writing and subscribed by the grantors. * * *"

Our court in the case of Lucia v. Schaefer, 109 Okla. 167, 233 Pac. 444, after quoting the foregoing statute, uses these words:

"Which statute would seem, in terms, to foreclose a claim by a donee of real estate by parol gift inter vivos, but, be that as it may, it is our opinion that to constitute a gift it must clearly appear that the intention was to transfer present title and not a promise nor the expectation of some future action. It must be a gift in praesenti. * * *"

The foregoing principles are adhered to in our state as shown by the following cases: Fouts v. Nance, 55 Okla. 266, 155 Pac. 610; Fulp v. Sill Mfg. Co., 101 Okla. 226, 224 Pac. 694; Voese v. Childress, 83 Okla. 60, 200 Pac. 997; Cannon v. Unruh, 84 Okla. 36, 202 Pac. 182; Johnston v. Baldock, 83 Okla. 285, 201 Pac. 654; Bahnsen v. Walker, 89 Okla. 143, 214 Pac. 732; Flechs v. Richie, 91 Okla. 95, 216 Pac. 644.

First. Assuming, then, that John Nolan made the statements attributed to him, did Michael take possession under the gift? He testified that his brother-in-law was at all times in possession of the house on the Mabry place, and, further, that he (Michael) had the place rented for the years 1923 and 1924, under a rental contract to pay John Nolan one-half the grain crop as rent. Corroborative of this, in the fall of 1925, he sued the administrator, and alleged that he was, during 1923 and 1924, in possession of said real estate under a lease with the owner, John Nolan, and the suit is predicated upon the disturbance of the possession of plaintiff under the lease by the administrator in July, 1924, and the appropriation of the entire crops for the year 1924 by said administrator.

"A tenant's continued possession, therefore, is not an act of part performance of his contract to purchase from his landlord, nor of his contract for a renewal of the lease." 36 Cyc. 659, and cases cited; Larney v. Aldridge, 31 Okla. 447, 121 Pac. 151.

It is unusual for an owner to become the tenant of his own land and to agree to pay another a rental for its use.

Second. Under the authorities, the making of substantial permanent improvements on the premises in reliance upon the gift was a condition precedent to a completed gift, and these must have been made with the assent of the donor and during his lifetime. Michael testified on this point that before John's death he cleaned up around the house, gathered up the trash, had a tree which had fallen near the house removed, and rolled up some barbed wire. Afterwards he painted the house and commenced the construction of a shed and perhaps braced the barn. These are negligible improvements as compared with those required by the law. All told they are as shown by the evidence of less than $100 in value, and those made before the death of the donor certainly could not have been more than one-fourth that sum. The rule is that acts done and improvements made must be of such a nature and extent that it is impracticable to restore the parties to their former status, and that it would amount to a fraud upon the part of promisor to set up the statute of frauds as a defense, and then receive the benefits of acts done by the party relying on said promise. Cannon v. Unruh, 84 Okla. 36, 202 Pac. 182.

Plaintiff claims that vital evidence offered by him was rejected by the court, but in practically every instance no attempt was made by plaintiff to show what the evidence would have been, and thus no question is presented to this court. Gross v. Lincoln, 81 Okla. 87, 196 Pac. 960. Plaintiff does offer to show by a witness that he heard a conversation between John and Michael prior to the purchase of the farm to the effect that the same should be purchased and taken in John's name, but out of the funds of a partnership in which John and Michael were interested. This alleged conversation appears to have been had more than 12 years before the bringing of this suit. If, in fact, the land was purchased with partnership funds, it was partnership property, and, it would seem, the only proper way to determine the interest of plaintiff would be an equitable action for an accounting and dissolution of the partnership, and not by this action, wherein the plaintiff, after the death of the alleged partner, claims to be the owner of the equitable title by an oral gift by the alleged partner, not of an interest in, but of the entire property. The exclusion of this evidence, therefore, is not reversible error under our holding as to the theory of plaintiff's case.

Our view with respect to the nature of plaintiff's action, under his pleading and proof, makes it unnecessary to discuss the contention that this was not an oral gift of the property, but was simply a contract

between decedent and his three brothers to the effect that he would will them the property if they would take care of him until death; but we may remark that, in this case, we have an instance of close kinsmen performing for their sick fellow just the ordinary ministrations and service, and, presumably, under the promptings of love and humanity. There was nothing peculiarly exacting or distasteful about these ministrations; there was nothing repulsive about John Nolan or his condition. He appears to have been a decent citizen, comfortably fixed, and in full possession of his faculties. After his first stroke he was confined and helpless for only about a month, and after the last stroke for only six or eight weeks, and a part of this time he was able to walk with assistance. These able-bodied brothers and one sister seem to have bathed him and fed him with the help of nurses, and, upon occasion, sat up with him. It is true that Michael gave some attention to his farms, but 'the brothers did not change their residence or mode of living radically in order to perform these necessary services. And while we do not say that such attentions can be accurately measured in money, we think we can say that such services can be measurably compensated without working any fraud upon those who have performed these kindly offices. The fact is that just such services are performed every day the world over without the thought of pay, and those who perform them esteem it not only a duty but a glorious privilege, especially where those involved are closely bound by ties of blood and affection.

Plaintiff sets out propositions Nos. 1, 2, 3, and 4, and from 1 to 9 subheads under each proposition, to all of which we have given painstaking attention, and we hold that such of them as are not herein passed upon are without merit. Many of them in no way even touch the controversy.

Plaintiff also complains that the court rendered judgment on the demurrer without weighing the evidence. We think no one could examine this record without concluding that the court not only weighed the evidence and gave the plaintiff the benefit of all his evidence, but made certain informal findings which clearly indicate that he had weighed the proof, and was convinced therefrom that the plaintiff not only had not sustained his burden of proof, but that he had not introduced any proof reasonably tending to support his action.

While we have no statutory provision for a demurrer to the evidence in an equity case in this state, it is a practice long recognized in Kansas, and followed in this jurisdiction, and a demurrer to the testimony will be treated by the court as a motion by the defendant for judgment for him upon the testimony as produced by the plaintiff.

When the trial is before the court without a jury, the court must eventually weigh the testimony, and there is no reason why it should not do so at the earliest possible time when the rights of plaintiff will not be cut off or impaired by his so doing, and when the plaintiff has introduced all his proof and rested, no rights of his will be impaired if the court then determines what has been proven. Penny v. Vose, 108 Okla. 103, 234 Pac. 601; Donaldson v. Josey Oil Co., 106 Okla. 11, 232 Pac. 821; Heldt v. Heldt, 118 Okla. 103, 246 Pac. 608; Tiger v. Ward, 60 Okla. 36, 158 Pac. 941; Culp v. Trent, 99 Okla. 112, 226 Pac. 348; Lowrance v. Henry, 75 Okla. 250, 182 Pac. 489; Porter v. Wilson, 39 Okla. 500, 135 Pac. 732; Sheppard v. Holt, 119 Okla. 169, 249 Pac. 302.

In the consideration of cases involving oral gifts of real estate, certain general principles are to be remembered: (1) The proof of such gifts, together with every element necessary to complete the same must be strong, clear and convincing; Fouts v. Nance, 55 Okla. 266, 155 Pac. 610; 28 C. J. 681. It has been held in Howard v. Stephens, 38 Cal. A. 296, 176 Pac. 65, and in Humble v. Gay, 168 Cal. 516, and Martin v. Martin (Tex. Civ. App.) 207 S. W. 188, that gifts first asserted after the death of the donor are regarded with suspicion. (2) The law regards with a jealous eye transfers of real estate, and especially will it scrutinize closely alleged gifts of such property made without any attempt to observe the statutory requirements as to method of transfer. This is shown clearly by our statute of frauds, and we think the case at bar furnished evidence of the wisdom of this statute.

It must be borne in mind that John Nolan was not stricken by lightning, nor did he fall dead without premonition. He passed through weary months with the end in sight He had every opportunity for conveying this property, if he so elected. He was an alert, shrewd, wide-awake business man. Some of the witnesses said that he intended to make deeds to these brothers, but he made none. One witness testified that he made a will in his own handwriting containing these very dispositions. If so, he must have

repented and destroyed it. The plaintiff claims that, while decedent knew how properly to dispose of the property not only by deed but also by will, instead of doing so he orally gave away a fortune to three of his brothers merely because they had done the brotherly part of taking care of him for a few months during sickness, with no provision for his four sisters living round about him, except a pittance to one who seemed most dear to him, and who, if all of plaintiff's evidence be true, was to be the special object of decedent's bounty. In fact, if the evidence of the Texas witnesses is true, she was to become wealthy out of this estate; and these three brothers were enjoined to be good to her; but under the final proof and their claims now, she would, under the alleged oral gift, be given a house and lot worth $1.200 or $1,400 and $500 worth of insurance, whereas these brothers claim under this gift, and for the services indicated the estate of perhaps $50,000 or $60,000.

The decedent, if he made such a gift, omitted any provision for the payment of his debts, burial expenses, and also any recognition of his three other sisters, who. it seems, might have a reasonable claim upon his bounty at the time of decedent's death.

The trial court indicated that it had studied closely the facts and proof in the case. that it had tried several similar cases, and was acquainted with the nature of the proof offered. and that, in its opinion. it did not approach the point of establishing. under the law, a gift to plaintiff. and its informal findings so held.

We have read, considered and weighed carefully the entire evidence and the record, and we hold that the judgment of the trial court was proper, and that the same is not against the clear weight of the testimony, and for which reasons the same is affirmed.

TEEHEE. REID. LEACH. and DIFFEN-DAFFER, Commissioners. concur.

By the Court: It is so ordered.