**NOLAN et al. v. MATHIS, Adm'r.**

No. 18686.   Opinion Filed Oct. 16, 1928.

Rehearing Denied Dec. 24, 1928.

W. H. C. Taylor, J. T. Johnson, and Walter Marlin, for plaintiffs in error.

Drennan & Drennan and Sam P. Ridings, for defendant in error.

BENNETT, C. This was a civil action in district court of Grant county, Okla., by Harry W. Mathis, administrator of John Nolan, deceased, against Thomas, Patrick and Michael Nolan, for the conversion of certain live stock, farming implements, machinery, furniture, and a certain grain elevator located near Lamont, Okla. The cause was tried to a jury, and from a judgment in favor of plaintiff, defendants appeal. The parties will be referred to as plaintiff and defendants in the order in which they appeared in the trial court.

The general facts are as follows: John Nolan, about 54 years old, and unmarried, died intestate at his home in Lamont, Okla., May 9, 1924, leaving as his only heirs at law three brothers, who are the parties defendant in this action, and four sisters. Harry W. Mathis is administrator of said decedent.

Decedent left an estate of perhaps $50,000 or $60,000 in value, composed of several farms, a grain elevator, live stock, farm machinery, equipment, etc. Immediately following the death of said decedent, his three brothers, Thomas, Patrick and Michael, took possession of and appropriated to their own use about $7,000 worth of personal property, and practically all of the real estate belonging to said decedent, claiming that decedent, a short time before he died, had made an oral gift to each of said brothers of certain farms, and also all of the personal property. Thereafter each of said brothers brought suit against the other heirs and the administrator of John Nolan, deceased, to quiet title to the land claimed by him under said gift, and the administrator brought this suit against the said three brothers for the value of the personal property so appropriated by them.

In 1922, John was stricken with paralysis, and for two or three months thereafter was unable to take care of himself, but later improved to such an extent that he could give fair attention to his business. In December, 1923, he went to Marlin, Tex., and later to Mineral Wells, Tex., for his health, but remained only a short time. During decedent's sickness he was given such attention as he required principally by Michael Nolan and Amelia, his youngest sister. Some care was given him also by the other brothers and perhaps by others of the family. Michael aided in the management of some of decedent's farms during 1923. While at Min-

eral Wells, in February, 1924, John suffered another paralytic stroke, and upon his request said brothers and said sister attended him there. He was not entirely helpless at this time, but was able to walk about with assistance, and a short time later he was carried to his home at Lamont where he died within about two months. For a few weeks prior to his death he required considerable attention. This was given by his brothers and said sister, aided by nurses who were employed.

Soon after the death of decedent, Michael, Patrick, and Thomas took charge of and disposed of practically all the personal property belonging to the estate, including about 30 head of horses and mules, also harness, wagons, farming implements and equipment. When the administrator, who was appointed July 5, 1924, approached said brothers for aid in assembling the personal property belonging to the estate, he was ordered off the lands of the estate by Michael and Patrick Nolan, and they refused him information as to the personal property and also possession of the real estate. The administrator made four or five visits to the brothers with the same result, and with the further result that he was never able to locate the personal property. Thereupon he brought this suit against said three brothers for the conversion of the personal property. Defendants objected that the elevator should not be included in said suit for conversion because same was real estate. Later a separate suit was filed asking that title to the elevator property be quieted in the administrator (this elevator being located on the railroad right of way under lease) ; thereupon defendants answered that the suit could not be maintained because the elevator was personal property. Upon consideration of these claims, the court ruled that the elevator was personal property, and permitted same to be included in the petition and suit for the conversion of the other personal property. Plaintiff's petition sets out a description and the value of these articles of personal property, and alleges its fraudulent conversion by defendants.

Plaintiff further alleged that, after the death of John Nolan, deceased, Michael, Patrick, and Thomas Nolan entered into a conspiracy and confederated together to cheat and defraud their four sisters out of the real and personal property belonging to said estate; that, in prosecution of this fraudulent design, each of them, in effect, represented to their sisters that John Nolan, deceased, left a will, and that said brothers, by seeming to agree among themselves that they would conform to the will of said decedent, planned, by this course, to inveigle their sisters into an agreement to either recognize the terms of the will, or come to an adjustment by which the said three brothers should secure practically all of the estate, and, that if this design should fail, then each of the three brothers should claim a certain part of the estate under a gift from John Nolan, deceased, and should bring suit to quiet title in the real estate so claimed by him, and that, as to the personal property, it should be divided among them as best suited their convenience. And that, acting under this arrangement, they claimed the real estate, brought suits for quieting title thereto, took possession of the personal property, and secreted it, or disposed of it in fraud of the sisters, the other proper heirs of the estate. The separate answers, in addition to a general denial, allege misjoinder, and that long before the death of John Nolan said personal property had been transferred to defendants. There was trial to a jury, and from verdict and judgment for plaintiff, defendants appeal.

Defendants, in their brief, on page 8, say:

"The following legal propositions are involved : 1. That the right to join three defendants, alleged tort-feasors, does not exist, unless all of them are engaged in the commission of the alleged torts; that where, as in the instant case, different articles of property are taken at different times and places, by different persons, a joint action will not lie."

This contention is so manifestly unsound that we shall treat it most briefly. It is elementary that the right to join several defendants is determined by the allegations as they appear in the petition. Southern Surety Co. v. Patterson Steel Co., 111 Okla. 39, 237 Pac. 588. Plaintiff having alleged a conspiracy, if there be proof of the same, the acts of one are to be considered as the acts of all, irrespective of the fact as to whether each actively participated or did not participate therein. 5 R. C. L. p. 1093.

"II. That where one of the articles alleged to have been converted is a grain elevator, and it is claimed by one of the parties as owner, such party having formerly been a copartner of the decedent, which copartnership had been dissolved before his decease ; the two other defendants cannot be joined in such action, where they neither claimed the same, and the proof shows, and the plaintiff himself testifies, that such persons never made any claim to such elevator."

Under the facts and pleadings in this case, this contention is equally untenable. We could not agree that one or more of the conspirators, after the dirty work has been done, might escape liability by refusing to claim the spoils. It is easily conceivable that, after the conspiracy had been carried through, Michael may have been given the elevator and the other two brothers might have been satisfied with the horses, mules and farming equipment; but we see no reason why all the parties to the conspiracy, under which plaintiff has been wronged, should not be made parties.

"III. That an executed agreement with the decedent. to care for him until his death, is a valuable consideration sufficient for the transfer of personal property of decedent."

Certainly a contract made with the owner of property. to the effect that, if certain kinsmen of his shall perform certain services for said owner, he will convey by will the property to such parties, under proper conditions, constitutes a contract with sufficient consideration for its enforcement; but in the instant case there is no contract claimed. Such claims as defendants had arose out of a **parol gift** from John Nolan, the owner. Under an almost identical state of facts, we held, in the case of Michael Nolan v. Harry W. Mathis, Administrator, No. 18703, 134 Okla. 70, 272 Pac. 857, that under the pleadings and under the evidence in that case, the plaintiff relied upon a gift, and that, if he had any claim. it was under such gift. In the case of Patrick Nolan v. Harry W. Mathis, Administrator, No 18869, 134 Okla. 86, 272 Pac 865, this court also held, when construing substantially the same pleadings setting out the identical conversations between the same parties, that it did not constitute a contract, and whatever right might be claimed under it must be predicated upon a claim of gift. We held in each of those cases that the evidence did not sustain a gift.

"IV. That the execution in the instant case, and the sale thereunder, is void."

We are at a total loss to know, in the consideration of the judgment and action of the court in the trial of this case, what this court has to do with an execution; whether void, voidable or valid.

We are unable to follow the defendants' brief in so far as it sets out six subheads under his first proposition. The first of these deals with the consolidation of cases, which we think should be finally disposed of by saying once more that the plaintiff re-

lies upon an allegation of conspiracy, and if there be proof of such conspiracy all are liable and may be sued together for any damages arising out of their wrongful conduct, and the question whether one or the other of said conspirators benefits or actively participates in the profits of, or actually participates in the wrongdoing, becomes immaterial.

Under subhead 2, defendant claims there is no evidence to sustain conversion by either Thomas or Patrick Nolan. We cannot concur with this reasoning; we will discuss that later.

Subheads 3, 4, 5 and 6 are without merit.

Defendants claimed that they were prejudiced by reason of the fact that there was another suit pending against Michael for an accounting upon the theory that Michael and John were copartners at the date of his death. This was explained in the evidence by the administrator who said that he brought an action of accounting, not for the elevator, but for any notes and accounts that Michael might have belonging to a copartnership of which John was a member; that he had never heard of any such copartnership, but that it was first claimed by Michael, and if, in fact, there was such a copartnership, that it was the administrator's duty to discover whether there were notes and accounts of which the estate of John should have the benefit. The question of whether or not there was a copartnership was submitted to the jury under instructions, to which there was no exception. It seems that Michael claimed there was such copartnership; the administrator that he knew of no such copartnership. It is hard to see how Michael or Patrick or Thomas could have been prejudiced in any way by submitting this to a jury. It is noteworthy that several pages of defendants' brief are taken up with statements that there was a copartnership for years between these parties. Since the proof was at variance, it was a question for the jury. Defendants contend that the question of whether or not there was a copartnership was a question of law. There was so little evidence of a partnership, perhaps it was a question of law; but, at any rate, defendants should not complain that the jury was allowed to pass on it.

The subheads under proposition 2:

"1. Submitting to the jury the question of conspiracy. for the reason that there was no evidence to support the same."

In our opinion there was substantial evidence of a conspiracy.

"A conspiracy is a combination of two or more persons to do a criminal or unlawful act, or to do a lawful act by criminal or unlawful means." Mangum Electric Co. v. Border, 101 Okla. 64, 222 Pac. 1002.

It is not, of course, the conspiracy itself which gives rise to the cause of action, for no one suffers damage by the unlawful combination of others to do injury, unless it is carried into effect and the complaining party is injured. When, however, the conspirators enter into a common wrongful purpose, and attempt to carry it out and damage results, the conspirators become liable as joint tort-feasors to the party injured. In the case at bar, the object and purpose of this unlawful compact was to cheat and defraud the four sisters of these brothers, and they proceeded in that enterprise after a most energetic fashion. They made the fraudulent representation, in effect, that there was a will. This was made upon numerous occasions and under varying circumstances to their sisters and requesting them to commit themselves to its terms, but without disclosing the document. They had no idea of disclosing any document. Finally, one of the sisters insisted that if there were such a will, to disclose it, and that they would make decision as to what they would do. Like the man in the Bible they went away sorrowful, but only to take another tack, to bring separate suits for parts of this real estate, to tie the estate up in litigation, to secrete and squander the personal property, which they did so successfully that the administrator was never able to lay his hands upon hair or hide of the 30 head of live stock, or to find any of the farm equipment. They had in hand the personal property, locked up as far as they could the houses, denied the authority of the administrator to take any of the property into possession, or to even go upon the land. They claimed all this real estate and personal property as a gift from their brother, who was then on the very verge of the grave, a gift made when no one else was present but the sick man and the alleged donees. We think that all these facts are sufficient to show a common design to make away with this estate and to defraud their sisters.

5 R. C. L. par. 37, p. 1088, is as follows:

**"Necessity of Direct Evidence.** Conspiracies need not be established by direct evidence of the acts charged, but may and generally must be proved by a number of indefinite acts, conditions and circumstances. which vary according to the purposes to be accomplished. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of the persons accused, done in pursuance of an apparently criminal or unlawful purpose in common between them. The existence of the agreement or joint assent of the minds need not be proved directly. It may be inferred by the jury from other facts proved. It is not necessary to prove that the defendants came together and actually agreed in terms to have the unlawful purpose, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. If, therefore, one concurs in a conspiracy, no proof of agreement to concur is necessary in order to make him guilty. His participation in the conspiracy may be established without showing his name or giving his description."

To the same effect are the following cases in Oklahoma: Mangum Electric Co. v. Border, supra; Harbison v. White, 56 Okla. 566. 156 Pac. 335; Nance v. Menefee, 112 Okla. 61, 242 Pac. 224.

Subhead 2:

"Failing to instruct the jury as to the acts necessary to constitute conspiracy."

It should be noted that no special instructions were asked by the defendants, nor were exceptions taken to the charge as given. We hold that under the charge as given there was no reversible error on this score.

Subhead 3:

"In holding that conspiracy can exist to do a lawful act."

Under the definition of conspiracy this can be done. We might add, however, that while a plan by three brothers to loot an estate and defraud their sisters of their heritage might be characterized by other terms, the mildest one we can recall is that it is unlawful.

Proposition 3. That the court committed error in permitting the witness, Bert Donaldson, to testify as to transactions had with the decedent, John Nolan, for the reason that Donaldson's wife is interested in the estate; committed error in permitting Harry W. Mathis and other witnesses to testify as to transactions had with deceased, but refused to permit the defendants to testify with reference to transactions had with deceased.

Defendants' contention is that Bert Don-

aldson was not competent to testify unless it was shown by the evidence that said witness was acting as agent for his wife, Mary Donaldson, in the matters to which he testified.

We think it should be remembered in this case that neither Bert Donaldson nor his wife was a party to this suit. The parties on the one side were Mathis, the administrator, and on the other Michael, Patrick and Thomas Nolan.

Defendants say that Bert Donaldson was permitted to testify as to transactions and communications had with decedent, John Nolan, and that his testimony was not competent under section 588, C. O. S. 1921; also, that Donaldson was permitted to testify on behalf of his wife and fell under the inhibition of section 589, C. O. S. 1921. Defendants set out in their brief no testimony of Donaldson alleged to come within the inhibition of section 588, and we are not required to go through the record to find such testimony. The record of Donaldson's testimony covers over 70 pages. The few objections aimed at his testimony were upon the ground that it was incompetent, irrelevant, and immaterial. It is the familiar rule in this jurisdiction that such objection does not raise the competency of the witness under the foregoing sections of the statute. Hartzell v. Hartzell, 42 Okla. 390, 141 Pac. 772; Bell v. Territory, 8 Okla. 75, 56 Pac. 853; Williams v. Joins, 34 Okla. 733, 126 Pac. 1013; Muskogee Elec. Traction Co. v. McIntire, 37 Okla. 684, 133 Pac. 213; Brownell v. Moorehead, 65 Okla. 218, 165 Pac. 408; Miller, Adm'r, v. Nanny, 91 Okla. 150, 216 Pac. 662.

The last-named rule is not purely technical, for, upon a proper objection to the witness as being **incompetent** under the statute, the party offering such witness might offer the proof through other witnesses not subject to the objection. We should, therefore, not permit an objection directed at the competency, materiality, and relevancy of the testimony itself to supply an objection which should have been directed at the competency of the witness under the statute.

Defendants next contend that the administrator's testimony was clearly incompetent under the statute. We know of no rule of evidence which would prevent his testifying. Of course, if he testified to a communication or transaction with decedent, he would open the door for contradictory evidence concerning the same matter, but we find in defendant's brief no evidence of this kind, and from the record we discover none.

Defendants next contend that the court erred in refusing to admit answers to the following questions:

"1. Q. Mr. (Thomas) Nolan, where did you get that machine?"

"2. I will ask you if you were ever in partnership with John Nolan?"

"3. Were you ever a member of the firm known as Nolan Brothers?"

"4. Where did he get them (horses)?"

"5. How is that?"

"6. Mr. (Michael) Nolan, how long has that elevator there at Lamont—when was it built?"

"A. 1903."

"7. And who put it up?"

"8. Were these horses and mules John's property or partnership property?"

It will be observed that as to these questions there was no offer made to show what the witness would have testified, which generally is fatal to the objection. It might be argued that to two or three of these questions the witness answered before an objection was made, but, on the other hand, it might be said that the answers of the witness were not stricken, but remained in the record, and the jury was not admonished to disregard the same. Clearly, the purpose of these questions was to show directly or indirectly transactions or communications with decedent.

The second paragraph of the syllabus in Fuss v. Cocannouer, 70 Okla. 36, 172 Pac. 1077, is as follows:

"Under the provisions of section 5049, Rev. Laws 1910, a party to a civil action against the administrator of the estate of a decedent is incompetent to testify, in his own behalf, to facts which will raise an implied contract between such party and the decedent."

It was held in Charlotte Oil & Fertilizer Co. v. Rippy, 123 N. C. 656, 31 S. E. 879, that Code section 590 disqualifies a surviving partner from testifying who composed a firm of which he was a member in an action against the administrator of a deceased partner.

"Nor are surviving partners competent witnesses to establish the existence of the partnership relation between themselves and the deceased or incompetent person." Jones' Commentaries on Evidence, vol. 5, pp. 4356-7,

citing Cooper v. Wood, 1 Colo. App. 101, 27 Pac. 884; Adams v. Morrison, 113 N. Y. 152.

"The prohibition * * * should be construed, not only to prevent the introduction of direct proof of such transaction, but to prevent its proof by indirection as well. So, the surviving party ought not to be permitted to attempt to prove a transaction inferentially by offering evidence that some third person did not do the thing which deceased is alleged to have done. * * *" Jones' Commentaries on Evidence, vol. 5, p. 4367 par. 2262.

But without respect to the competency of this evidence, we are of the opinion (assuming that the answers would have been favorable to defendants), that the admission of this testimony could not have affected the result, for no effort was made to show a transfer of the title to this property from decedent to defendants, and without that the possession was entitled to slight consideration as indicated later herein.

We have gone over this entire record, and we find that the attorneys for each side have made a sincere effort to prevent the introduction of testimony by witnesses incompetent under the statute (section 588, C. O. S. 1921). The record covers hundreds of pages, and the same is singularly free from substantial error.

The fourth proposition is that the court erred in permitting the jury to consider the inventory filed in the county court in the matter of the estate of John Nolan, deceased. It seems from the record that the defendants put this exhibit in proof, and in the record it is treated as a part of their case. We see no ground for complaint now that the jury were allowed to give this exhibit attention either in the jury room or elsewhere, nor can we see how it could have prejudiced the defendants in any way. If the defendants were referring to the inventory attached to plaintiff's petition, or referred to in the court's charge, no exception was taken to either at the time, and there is none in the record upon which to predicate the defendants' objection.

Finally, it is argued that the verdict is excessive. They argue first that the jury, in calculating the interest, allowed $127.67 in excess of the legal rate of six per cent. We do not know how the jury arrived at the value of the property converted, but the answer to the special interrogatory as to the value of the property taken was $6,388. We have gone over the evidence, and we find that there is proof in the record that the value of the property taken by the defendants was $7,176. The special verdict was for about $800 less than this sum. The interest on $6,388 from John Nolan's death until the rendition of the verdict amounts to $1,066.80, which added to the amount of the special finding equals $7,454.80, which is about $12 in excess of the amount of the general verdict rendered against the defendants. Defendants calculate interest from the date of the appointment of the administrator, whereas, practically all plaintiff's proof indicates that the property was converted at the time of or just after John's death, and the defendants' pleading and some of their proof indicate that they took possession of a part of this property, as they say, "long before" the death of said John Nolan. The instruction of the court was to allow interest from the date of the conversion of the property, and no exception was taken to this instruction. This was a jury case, and their finding, upon sufficient evidence and under proper instructions of the court, is conclusive.

It must be borne in mind that, under the pleadings and under the proof, it was the theory of the parties that all this personal property (barring possibly the elevator), belonged to John Nolan, and that defendants' only claim thereto was by oral gift. This record is devoid of any direct proof or attempt at such proof of a gift or sale of this property by the owner to defendants. To substantiate a parol gift inter vivos requires strong and convincing evidence. They introduced none showing this gift. It is not surprising, therefore, that the trial court instructed the jury that the defendants had introduced no proof of such gift under which they claimed the property, nor is it strange, under the circumstances, that the defendants permitted this instruction without exception.

The elevator was and is treated in the case as personal property, and the defendants claimed that it either passed under the general gift upon which they relied from John, or upon an inference that it belonged to a copartnership of which John and Michael were the members. The proof, however, as to the copartnership was almost negligible. For instance, the banker, who for years had kept John's account, through which largely the affairs of the elevator had been run, seemed never to have heard of the alleged interest of Michael in the enterprise. Many other local witnesses testified to the same effect. This issue, however, was submitted to the jury under fair instructions, which were without exception, and they settled the matter upon evidence which was

not only sufficient, but well nigh overwhelming.

Defendants contend also that quite an amount of this personal property was in their possession at the date of John's death. The court cannot close its eyes to the fact that John Nolan was a sick man for months; that Michael was taking care of him and also supervising his farm property. Under these circumstances, the possession of a part of this property by Michael should be given scant weight, for, if we should concede that all personal property was in possession of defendants at John's death, it would establish nothing as to the ownership, for under the defendants' theory of the case, proof of a gift or transfer of title to this property was essential to their success. To hold otherwise would mean that every estate, so far as personal property is concerned, would be wholly at the mercy of a trespasser, a trusted employee, or a dishonest heir, who, with a strong hand, might take possession of the estate at the death of the owner. Where a gift inter vivos is relied on, it must be established by strong, clear and convincing evidence; possession must be given during the lifetime of the donor.

We have given this case careful attention, have made a study of the entire record, and are convinced that the defendants have had a fair trial, and that their grounds for reversal are without merit. Wherefore, the judgment of the trial court is affirmed.

FOSTER, LEACH, DIFFENDAFFER, and HERR, Commissioners, concur.

By the Court: It is so ordered.