## CITY OF PAWHUSKA v. CRUTCHFIELD.

No. 19815. Opinion Filed Dec. 16, 1930.

A. B. Campbell, for plaintiff in error.

John W. Tillman, Fred A. Tillman, and Welcome D. Pierson, for defendant in error.

BENNETT, C. William Edward Crutchfield, an eleven-year old boy, by his next friend, brought suit for damages for personal injuries against the city of Pawhuska. The case was tried to a jury, resulting in a judgment for $1,250 for the minor. The city appealed. The parties will be referred to as they appeared in the trial court.

Plaintiff and his parents lived on Eighth street in Pawhuska, a city of the first class. The city operates its electric light plant. In June, 1926, there was a storm in said city, and a tree was blown down, carrying with it the electric lines of defendant in the street near plaintiff's home. These live wires remained for some days in the street without repair. The morning after the storm, plaintiff's mother sent her daughter to the home of a neighbor to telephone the city as to this situation. Later, at her request, Mrs. Ward, a neighbor, called the city light office over the telephone, No. 51, and advised them that the electric wires were down near the Crutchfield home on West Eighth street, and that the condition was dangerous to the many children around there, and requested the city to remedy the situation, and informed them that Mrs. Crutchfield was afraid to leave home on account of the danger to her children. This was the day after the wires fell. The following day Mrs. Crutchfield caused another neighbor, Mrs. Shorten, to deliver to the city over the telephone a similar message. Mrs. Crutchfield heard these calls and the messages to the city. The wires were not taken up for three days. After these notices, and on the third day after the storm, the plaintiff was discovered by his mother sitting with his head in his hands and with his eyes red and inflamed and water streaming from them. It was ascertained that the

boy's eyes had been injured in some way by the live wires. The eyes were in such condition that he had to remain in a dark room for five days. The city physician was consulted. He recommended an eye specialist. Plaintiff was in much pain and lost his appetite. After the period in the dark room, he was not able to stand light; his eyes were inflamed and continued to water. This condition continued for many months. On this account plaintiff was taken from school and lost substantially the next school year. He complained of his forehead, the back of his neck and eyes; could scarcely read, his eyes burned, was very nervous; would try in vain to read the funny papers. He had no trouble with his eyes before and had not missed school. For a long time his eyes were much inflamed. He was taken to several doctors and received various treatments.

Mrs. Crutchfield testified that she warned plaintiff that the wires were dangerous; that she stayed at home to watch the children during the time the wires were down, except when she went to telephone the city; her husband was away at work; she had to do her housework. The tree that was blown down was about one or two feet in diameter, was half dead and stood near the wires.

Plaintiff testified that he and a neighbor boy were playing with the wires; that each would hold a wire and put them against an old saw which they had found and the sparks would fly and holes would be burned in the saw. He did not know that it would hurt him, but all of a sudden a big flash hit plaintiff in the face and he became almost blind. His eyes pained him very much; he was compelled to quit school on that account. Witness can read for only a short while; that his eyes are swollen together in the morning. The wires were down two days before witness played with them; he was hurt on the third day. The insulation was off the wires near the ends. While he was handling the wires with his bare hands there came the big flash which hurt him; he was down on his knees with his head near the wires. Witness went that day to see Dr. Walker and Dr. Goss; later he saw Dr. Rust, who treated him; also consulted Dr. Williams. Witness now wears glasses under advice of Dr. Allison, an eye specialist.

Several doctors testified as to the condition of plaintiff's eyes. Dr. Williams said that on September 13, 1926, there was inflammation of the back part of the eyeball, the retina, in which the nerves enter the eyeball and the interior surface of the eyeball, both eyes; on September 27th there was congestion of both of the disks and both of the eyeballs, but not as much as there was on the prior date. Advised the boy to stay out of school for a while. Witness thought that perhaps the injury would not be permanent. A thorough examination October 9th showed the right eye still congested, but the left was clearing; the boy's vision was 15/20, or three-fourths normal. This might have been caused by the inflammation and a stigmatism which he also has. This condition of the eyes might have been produced by a flash of electricity. The eyes required medical care and rest from school work.

Mr. Campbell, witness for defendant: Was superintendent of the city electric light plant; first saw plaintiff June 5, 1926; the city manager had called witness into his office and said a report had come in that some wires were down in Nichols-Ruble addition; witness went over and got in touch with plaintiff; found the wires down. A storm had blown down the wires at several places. A tree with decayed trunk had blown down and in falling had broken down the wires. The storm was on June 3rd. Upon discovery of plaintiff's injury, witness took him to Dr. Goss for medical attention. After examination the doctor advised that he be taken to Dr. Rust, and this was done. Plaintiff said the injury came from electric flash, burns from touching two wires together. The boy said that one "Shorty," a mechanic, touched two wires together causing the injury. Witness had plaintiff treated, but did not see him again. The wire was 110 volt wire. This line is near other lines of higher power, but if there had been a short circuit the fuse would have blown out. Made no investigation of the wires in this locality from the date of the storm up to the 5th. All the men were busy.

Dr. Rust found plaintiff suffering with photothalmia, electric sore eyes, caused by an electric flash, indicated by marked enlargement or congestion of the blood vessels of the eye and the lining of the lids and the covering of the eyeball. The lids were swollen and congested. That condition would probably result from a very intense light. Witness examined the patient several times. The eyes improved and finally recovered.

Mrs. Crutchfield testified that Dr. Rust told her the boy's eyes were seriously injured; would require a great deal of treatment and that the condition might result

in destruction of the vision. She did not authorize Mr. Campbell or anyone else to take plaintiff to the city for treatment.

Defendant groups its contentions under three heads: (1) That the court erred in admitting improper evidence for plaintiff; (2) that the court erred in rejecting competent evidence offered by defendant; (3) that the evidence does not sustain the verdict and judgment; and (4) that the recovery is excessive. Our discussion will be in the same order.

1. Plaintiff's mother testified that she had requested Mrs. Ward to telephone the city that the wires were down near her home, and that she was present and heard Mrs. Ward's part of the conversation with the city. This was objected to as hearsay. The evidence is undisputed that the proper telephone number of the city electric department was called by Mrs. Ward. If plaintiff had talked with the defendant about the wires and their condition, certainly it would not have been hearsay. The only purpose of the communication was to give notice to the city of the dangerous situation. It would be strange indeed if that notice could not be shown by a statement of the owner of the premises on which the dangerous condition existed, or whose safety was thereby threatened, even if such statement were made over the telephone. It is contended that there was no showing as to who answered Mrs. Ward's call. That was not necessary. Those who install telephones in their places of business impliedly invite the business world to use that means of communication with them with respect to the business there carried on, and the plain inference is that they authorize communications made over the telephone in ordinary business transactions. General Hospital Society v. New Haven Rendering Co., 79 Conn. 581; Wigmore on Evidence (2nd Ed.) par. 2155; Chamberlayne on Modern Evidence, vol. 1, par. 794; Rogers Grain Co. v. Tanton, Trustee, 136 Ill. App. 533, 538; Shawyer v. Chamberlain, 113 Iowa, 742, 84 N. W. 661. This point has been determined also by this court in Heckman v. Davis, 56 Okla. 483, 155 Pac. 1170.

"Where a person is connected by telephone wire with the place of business of one with whom he desires to speak, and is answered by one assuming to be such person, it is presumed that the answering person is he whom he assumed to be." Jones' Commentaries on Evidence, pp. 349-350.

The same doctrine is announced in Jones' Commentaries on Evidence (2nd Ed.) vol. 2, p. 1481, citing C. R. I. & P. v. Potter, 36 Ill. App. 590, and Reed v. Ry. Co., 72 Iowa, 166, 33 N. W. 451.

The important part of this testimony is not what plaintiff's mother requested Mrs. Ward to telephone, but what Mrs. Ward did actually telephone to the city. The law travels somewhat slowly, and is hesitant in making new precedents, but the telephone has established itself thoroughly in the business world and the amount of business transacted over it is stupendous. At this time, to question such a means of communication would be folly. It might be noted, too, that another witness, Mrs. Shorten, testified, without objection, that she gave the same information to the city. There is no merit in this contention of defendant.

It is next objected that the witness Campbell was not permitted to testify as to what the other boy, who was with plaintiff, said with reference to the manner in which the injury occurred. This objection is reflected in the following quotation:

"The Court: Just tell what he said, that is, what he is asking for, anything this boy said would be competent. A. These boys were injured—not injured necessarily, but irritated from a flash burn produced from touching two wires together, you see, the two ends at the bare points, by a mechanic by the name of Shorty. Q. Did this boy tell you that is what did it? A. Yes, sir. Q. And did the other boy make a statement on it? A. Both made the same statement."

The court properly struck out the answer to the last question. This evidence could be offered only, first, to impeach plaintiff, or second, as direct evidence as to how the injury occurred. It was not reversible error to exclude it on the first theory, for, in the answer preceding, the witness quoted plaintiff to the effect that the accident occurred in a manner different from that detailed by him here. The contradiction of plaintiff was complete, if the statement of this witness be true. The evidence sought would have added nothing to the value of that already introduced for impeachment purposes. No foundation was laid by examining plaintiff as to any statement made by his comrade at any time or place. The rule is general that before evidence of impeachment is offered against a party, he should be given opportunity to deny, to admit, or to explain the matter in apparent conflict.

In Goldsby, alias Cherokee Bill, v. United States, 160 U. S. 70, a paragraph of the syllabus is as follows:

"While it is competent, if a proper foundation has been laid, to impeach a witness by

proving statements made by him, that cannot be done by proving statements made by another person, not a witness in the case."

The action of the court might be defended too upon other grounds; the answer of the witness was a pure conclusion. The court would more readily strike it out upon this ground for the reason that this same witness, in answer to the court's inquiry as to what the plaintiff said, seemed to labor to exculpate defendant. This effort stands alone and unaided to show that the accident did not occur as plaintiff testified. No effort was made by defendant to produce as a witness the boy whose statement they wished to introduce, nor the mechanic "Shorty," whom, by inference, they charged with responsibility for the injury, nor is their absence in any way accounted for. The best evidence of which the case is susceptible should be offered. Their evidence would be preferable to their quoted statements.

Upon the second theory the evidence is not competent. Jones, Commentaries on Evidence (2d Ed.) vol. 6, pp. 4769 and 4770, is as follows:

"It often happens that impeachment by proof of inconsistent acts or statements is of vital importance in its effect upon the credit of the witness; and it is not infrequent that jurors fail to understand that such testimony is only received to affect the credibility of the witnesses. It is clearly the rule and theory, however, that the impeaching testimony does not establish, or in any way tend to establish the truth of the matters contained in the contradictory statements. These statements are not substantive testimony; that is to say, they are not evidence of the truth of the matters stated, but their force and effect is to be strictly confined to the object of impeaching the credit of the witness who is shown to have made them."

See, also, Law v. Fairfield, 46 Vt. 425.

Defendant made no offer to show what the evidence would have been if the witness had been permitted to testify. This is required. Federal Intermediate Credit Bank v. Cosby, 134 Okla. 1, 272 Pac. 436; Nolan v. Mathis, 134 Okla. 79, 272 Pac. 868. The answer of the witness was a conclusion and was properly stricken out, and does not meet the rule. Metropolitan Life Ins. Co. v. Plunkett, 129 Okla. 292, 264 Pac. 827. Aside, however, from any question of incompetency, we hold, after examining this record, that the admission of the evidence would not have changed the result. Section 319, C. O. S. 1921.

2. The contention is made that Jennie Seth, a witness for defendant, was not permitted to state what was the usual method of handling complaints made to the city. She had theretofore testified that no complaint or notice was given the city. If no report were made to her office, her custom in dealing with such reports would be immaterial.

3. It is contended that the evidence does not sustain the judgment; that there was no evidence of negligence. This position is little short of absurd. There was a storm in Pawhuska, not a terrific storm, but it blew down in several places in the city electric wires charged with this dangerous, if not deadly, current. There is much proof that they had repeated notice of this dangerous situation and of the call for help from an apprehensive mother, under the fear that her children would be injured or destroyed by these wires. At the least they remained down on the public street for two or three days, while the mother, as best she could, watched over her children, meanwhile trying to move the city to action. If the half of this evidence is to be believed, the negligence of the city is inexcusable, and it is fortunate in not being made to answer for more damages than has accrued in this instance. Nothing is more innocent in its appearance or more deadly in its potential effect than a broken live wire left in the city street. It gives no notice of peril either by sound or by sight, or through any of the senses, except through the sense of touch, and the warning then is too late. Electricity is a wonderful servant when kept in leash, but loosed, the scourge of it is quick and terrible. Care commensurate with the danger to be avoided must be exercised by the city with respect to its electric lines. A storm is a signal for such city to be on the lookout for fallen lines, and if their electrician is sick, absent, overworked, or indisposed, they must get another, or others, to meet the situation or face the consequences.

Two of the notices informed the city that school children were round about this dangerous nuisance left on the public street, and their answer was that they would give it attention when they got to it. Their argument now is that if they had given this place attention damage might have been suffered elsewhere. The evidence does not disclose how long it would have taken to pick up and make safe these broken wires, but it is shown they were dangerous, and it appears under this record they had notice of the facts. The conduct of the city in allowing this condition to remain without

attention for two or three days is little, if anything, short of wanton.

4. Excessive recovery. We shall not detail further the evidence. Plaintiff's eyes were not only painfully, but perhaps substantially injured. There is much medical evidence, some of which we can understand. This boy was confined for five days in a dark room, and there is evidence from which a jury might infer that his vision was to some extent affected. He was out of school on account of his eyes for two or three terms. Reading now is difficult. Twelve hundred and fifty dollars for such an injury to the eyes of just an ordinary 11-year old boy may be excessive, and it may indicate passion and prejudice on the part of the jury, but we cannot so appraise it. It is argued in the supplemental brief that the court should not have allowed the jury to consider anything more than temporary disability, and reference is made to Jones v. Sechtem, 131 Okla. 155, 268 Pac. 201. That case states the law as we understand it with reference to the facts in that case, but same is not controlling here. We have discussed the holding there in the case of Rhodes v. Lamar, recently decided, 145 Okla. 223, 292 Pac. 335, and the doctrine announced there is more applicable here. Plaintiff evidently suffered a severe injury to his eyes. Evidence as to his ability to read, to attend school, and pursue his ordinary lessons, to observe picture shows and the daily papers, discloses a sufficient injury to warrant a judgment for $1,250, even if his vision was not permanently injured. The verdict is not excessive.

For the reasons given, the judgment of the trial court is affirmed.

TEEHEE. LEACH, EAGLETON, DIFFENDAFFER, and HERR, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) anno. 6 L. R. A. (N. S.) 1180; L. R. A. 1918D, 720. (4) 2 R. C. L. p. 203; R. C. L. Perm. Supp. 376; R. C. L. Continuing Perm. Supp. p. 42. (5) anno. L. R. A. 1915F, 30; 46 A. L. R. 1281.